THE FIDELITY & CASUALTY COMPANY OF NEW YORK, Plaintiff-Appellant, v. NALCO CHEMICAL COMPANY *et al.*, Defendants and Third-Party Plaintiffs-Appellees (Corroon & Black *et al.*, Third-Party Defendants).

First District (3rd Division)   No. 85—2817

Opinion filed March 11, 1987.—Modified on denial of rehearing June 10, 1987.

Clausen, Miller, Gorman, Caffrey & Witous, P.C., of Chicago (James T. Ferrini and Frank L. Schneider, of counsel), for appellant.

David J. Gibbons, Pamela J. Kempin, and Stephen N. Landsman, all of Chicago, for appellees.

JUSTICE WHITE delivered the opinion of the court:

Plaintiff, Fidelity & Casualty Company of New York (F&C), sued for a judgment declaring that it had no duty to defend or indemnify defendants Nalco Chemical Company (Nalco) and Industrial Bio-Test Company (IBT) in 11 suits filed against Nalco and IBT. Defendants counterclaimed for amounts expended in defense and settlement of the 11 suits. Defendants and F&C moved for summary judgment on the issue of the duty to defend, and the trial court denied both motions. Following a bench trial limited to the issue of F&C's duty to defend, the court entered a judgment for defendants. Pursuant to Supreme Court Rule 304 (103 Ill. 2d R. 304(a)), the trial court found no just reason to delay appeal of the order. F&C appeals.

IBT was a chemical testing laboratory which performed toxicological studies and other testing procedures, primarily for chemical manufacturers. Nalco, a chemical manufacturer, acquired IBT in 1966, and F&C allowed Nalco to include IBT as an additional insured under its comprehensive general liability policy. The general liability policy provided coverage only for occurrences which cause "bodily injury" or "property damage." Nalco sought further insurance for IBT's operations, and in 1971 F&C and Nalco agreed to add two endorsements to the policy to include coverage for incidental malpractice and veterinarians' professional liability. The incidental malpractice endorsement amended the definition of "bodily injury" to include "injury arising out of the rendering of or failure to render professional services by any physician, dentist or nurse" employed by Nalco. F&C did not charge any premium for these two endorsements. Nalco continued to seek further insurance for IBT, and F&C agreed to add a laboratory endorsement to the policy, effective January 1, 1973. It charged an additional

annual premium of $3,831 for including the laboratory endorsement.

In August 1976, Anthony Desimone, who had purchased stock in Syntex Corporation after September 1975, brought a class action suit against Syntex, IBT, and several officers and employees of IBT and Syntex, alleging that IBT conducted tests for a drug which Syntex produced. Desimone alleged that IBT conducted those tests improperly, and IBT's reports on those tests were false and misleading. Syntex submitted IBT's reports to the Food and Drug Administration (FDA), and, on the basis of those reports, the FDA approved the marketing for the drug. The FDA subsequently discovered irregularities in IBT's reports and testing procedures. On August 5, 1976, the FDA gave notice of possible withdrawal of marketing approval for the drug. Trading in Syntex stock was halted, and its price dropped sharply. Desimone alleged that IBT's fraudulent statements to Syntex and the FDA caused the price of Syntex stock to be artificially inflated after September 1975 and therefore it caused Desimone's loss.

In September 1976, Harry Lewis, who purchased shares of Syntex stock between March 1973 and October 1975, brought a similar class action suit against Syntex, its officers, and IBT. In December 1977, Henry Lloyd brought another class action suit against Syntex, its officers, and IBT, alleging that he purchased options in Syntex stock. Lloyd, Lewis, and Desimone all alleged that IBT's failure to report its improper testing procedures constituted a violation of section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. sec. 78j(b) (1982)) and that the violation caused them to incur substantial economic losses. IBT forwarded summonses and complaints to F&C in the Desimone, Lewis, and Lloyd suits. F&C refused the tender of defense, and it notified IBT that the allegations of the complaints were not covered by the insurance policy.

Syntex sued IBT for profits lost due to IBT's breach of its contractual obligation to perform tests properly. It alleged that IBT failed to perform some tests and submitted fictitious data for those tests, and it also alleged that "IBT made a number of clerical and recording errors *** attributable to animal misidentification." F&C did not accept IBT's tender of defense of the suit. IBT settled all of the claims related to Syntex in February 1979.

Between 1977 and 1981, Xttrium Laboratories, Inc., Wesley-Jessen, Inc., Sandoz, Inc., Mobay Chemical Corporation, Ciba-Geigy Corporation, Olin Corporation, and Chevron Chemical Company filed suits against IBT and Nalco. Each plaintiff corporation stated a cause of action for breach of contract based on allegations that IBT performed tests improperly and IBT submitted incomplete and inaccurate test

results. The plaintiffs also stated a variety of other causes of action, including actions for negligence, fraud, and wilful and wanton misconduct based on IBT's failure to perform tests and its creation of fictitious test results. All of these seven plaintiffs sought to recover the cost of auditing test results and retesting, moneys paid to IBT, and lost profits. None sought to recover any amount for bodily injury to humans or animals.

IBT also tendered defense of these seven suits to F&C. F&C rejected all of the tenders of defense. IBT settled all of the lawsuits by early 1983. In a criminal action stemming from charges related to the 11 lawsuits, the president and three other employees of IBT were convicted of scheming to defraud IBT's clients and several government agencies. Three of those convictions have been affirmed on appeal. *United States v. Keplinger* (7th Cir. 1985), 776 F.2d 678, 683, *cert. denied* (1986), 476 U.S. 1183, 91 L. Ed. 2d 548, 106 S. Ct. 2919.

At a hearing on F&C's and IBT's motions for summary judgment, defendants conceded that the comprehensive general liability policy did not cover any of the 11 lawsuits, but they maintained that the laboratory endorsement provided coverage. The laboratory endorsement, which is captioned "MEDICAL OR X-RAY LABORATORIES—PROFESSIONAL LIABILITY," states:

"This endorsement modifies such insurance as is afforded by the provisions of the policy relating to the following:

HOSPITAL PROFESSIONAL LIABILITY INSURANCE

This endorsement forms a part of the designated policy ***.

\* \* \*

It is agreed that:

1. Provision I is amended to read:

The company will pay on behalf of the *insured* all sums which the *insured* shall become legally obligated to pay as *damages* because of:

(a) injury arising out of the rendering of or failure to render, during the policy period, professional services in the performance of clinical-pathological examinations and services for diagnosing the status of health, disease or injury of human beings or animals, or the taking of X-ray pictures,

\* \* \*

and the company shall have the right and duty to defend any suit against the *insured* seeking such *damages* even if any of the allegations of the suit are groundless ***." (Emphasis in original.)

The endorsement designates the comprehensive general liability policy as the policy modified, although that policy and its endorsements contain no provisions relating to hospital professional liability insurance. F&C argued that the laboratory endorsement, like the incidental malpractice endorsement and the veterinarian's professional liability endorsement, related solely to medical malpractice, and in the context of medical malpractice insurance "injury" means bodily injury. IBT argued that the endorsement was a form of "errors and omissions" coverage, parallel to professional liability coverage for engineers and architects. In the context of an "errors and omissions" policy, "injury" would not be limited to bodily injury. The trial court stated that in its opinion the language of the endorsement itself was unambiguous, but the trial court denied both motions for summary judgment, and it held a trial limited to the issue of the intentions of the parties at the time they agreed to the laboratory endorsement.

Royal Gordon, who had retired from his position as casualty vice-president at one of F&C's subsidiaries, testified that in 1971 and 1972, he participated in several meetings with representatives of Nalco and Corroon & Black, an insurance broker. He testified that in his understanding, the laboratory endorsement was intended only to cover bodily injury caused by laboratory personnel other than doctors, nurses, and veterinarians. "The injury that we *** had spent a year and a half *** discussing was injury to the people on whom these tests were being performed." Gordon testified that F&C "would not have intentionally provided *** coverage" for IBT's failure to properly perform its contractual obligations. He admitted on cross-examination that he never stated in his correspondence with Nalco or Corroon & Black that coverage was to be limited to test subjects. He testified that IBT sought coverage parallel to architects' and engineers' professional liability coverage, but F&C refused to sell it that insurance.

John Gilbert, who had been an underwriter of commercial casualty insurance for F&C, testified that IBT sought coverage for negligent administration of tests and F&C agreed to provide coverage for the testing operations. Corroon & Black representatives discussed with him coverage only for injuries to human beings; failure to perform tests required by contractual agreement would not be covered under a liability policy.

John Kelly, an account executive for Corroon & Black, testified that he discussed medical malpractice coverage for IBT with F&C, including coverage for injury to human subjects of IBT's tests. He did not discuss possible liability for failure to run tests or for the cost of rerunning tests. As he understood the laboratory endorsement, it cov-

ered only injury to humans and animals. Kelly testified that he sought broad professional liability policies. Burns continued to discuss broad professional liability coverage for all of Nalco, to insure against all consequences of professional "errors and omissions."

Stephen Burns, an employee of Corroon & Black, testified that professional liability coverage is much broader than general liability coverage. He believed that in the laboratory endorsement F&C had provided the full coverage Nalco sought for IBT's operations, particularly because the word "injury" in the endorsement was not qualified. On cross-examination he testified that in 1971 he sought professional liability coverage for Nalco parallel to architects' and engineers' liability coverage, and Gordon of F&C responded that F&C was no longer writing coverage for "business risk[s]," such as the risks covered by architects' and engineers' professional liability coverage for IBT with F&C, including coverage for injury to human test subjects. He testified that F&C eventually agreed to supply such coverage. On cross-examination, F&C's attorney asked him to clarify:

"Q. *** [I]t's your testimony that *** [F&C] proceeded to issue an endorsement to provide professional liability coverage to Bio-Test?

A. To Nalco.

Q. To Nalco for the operations of Bio-Test?

A. Yes."

John Ross, who was Nalco's director of risk management from 1971 to 1978, testified that he sought broad professional liability insurance for IBT, and he thought F&C agreed to provide such coverage. He was never convinced that the laboratory endorsement expanded coverage beyond that provided in the general liability policy, so he continued to seek broad professional liability coverage for IBT after the laboratory endorsement was signed. He had not sought coverage for possible harm to the animals tested by IBT because most of those animals were owned by IBT. He also testified that he believed that there was little risk of harm to human subjects of IBT's tests and that risk was already covered by workers' compensation and the general liability policy.

Rodney Bloom, a vice-president at Nalco, testified that Nalco sought professional liability coverage for IBT's "negligent responsibility with respect to administration and testing" and F&C agreed to provide such coverage.

The trial court found that the coverage provided by the laboratory endorsement was not restricted to bodily injury, and therefore it found that F&C had a duty to defend the lawsuits against IBT. On appeal

F&C contends that the trial court misconstrued the policy and ignored evidence of the intentions of the parties.

Our objective in construing contracts, including insurance contracts, is to give effect to the intentions of the parties. (*Associated Indemnity Co. v. Insurance Co. of North America* (1979), 68 Ill. App. 3d 807, 827, 386 N.E.2d 529.) In order to determine the intent of the parties, we look first to the wording of the contract. (*Ohio Casualty Insurance Co. v. Tyler* (1980), 85 Ill. App. 3d 410, 412, 407 N.E.2d 77.) In the words of the laboratory endorsement, F&C agreed to "pay on behalf of [Nalco] all sums which [Nalco] shall become legally obligated to pay as *damages* because of: (a) injury arising out of the rendering of *** professional services in the performance of clinical-pathological examinations and services for diagnosing the status of the health *** of human beings or animals." (Emphasis in original.) IBT was principally engaged in the business of performing clinical evaluations of various products. The parties agree, and the evidence shows, that this endorsement was intended to expand coverage beyond "incidental" malpractice coverage to coverage for services IBT rendered in its principal business. The tests IBT ran for various chemical manufacturers, and the treatment it provided subjects in the course of those tests, were described in the laboratory endorsement as "clinical-pathological examinations and services for diagnosing the status of the health *** of human beings or animals." Thus, F&C agreed to cover any "injury arising out of the rendering of or failure to render *** professional services in the performance of" IBT's tests, including the tests run for the eight manufacturers who sued IBT for failure to perform tests properly. IBT rendered professional services for both its test subjects and its corporate clients. The laboratory endorsement provides coverage for injury caused by either kind of professional service.

F&C argues that under the laboratory endorsement it provided coverage only for injuries occurring during the performance of the tests, and therefore the coverage is limited to injury to human and animal test subjects. However, the laboratory endorsement expresses no such limitation. F&C agreed to cover injuries "arising out of" the performance of the tests. Injuries to IBT's corporate clients may certainly be caused by, or arise out of, mistakes in the performance of tests, although such injury would not occur during the tests. We find that the coverage provided by the laboratory endorsement is not restricted to coverage for bodily injury to test subjects; for an injury to be covered under the terms of the laboratory endorsement, it must arise out of the professional services IBT rendered or failed to render, but the kind of injury covered is otherwise unrestricted by the terms of the laboratory

endorsement. See *Squires v. Hayes* (1968), 13 Mich. App. 449, 452-53, 164 N.W.2d 565, 567.

Thus, as the trial court found, the laboratory endorsement considered in itself is broad enough to cover some of the injuries alleged in the complaints against IBT. However, the trial court denied IBT's motion for summary judgment, apparently finding that the endorsement is ambiguous when it is considered in the context of the general liability policy. There is ambiguity inherent in the fact that the endorsement is ostensibly a modification of provisions relating to hospital professional liability insurance, and the general liability policy contains no such provisions. The trial court appropriately gave F&C the opportunity to show that the laboratory endorsement, in the context of this policy, did not provide coverage as broad as appears from the wording of the endorsement alone.

F&C contends that provisions of the general liability policy restricting coverage to "occurrences" which cause "bodily injury" or "property damage" are also applicable to the laboratory endorsement. The laboratory endorsement states that it is a modification of provision I of the general liability policy, particularly modifying the provisions relating to hospital professional liability. Provision I of the general liability policy states that F&C agrees to pay for liability due to occurrences which cause bodily injury or property damage, with enumerated exceptions. The definition of "occurrence" in the general liability policy excludes all coverage for intentional professional acts, and therefore the provision restricting coverage to "occurrences" cannot apply to the three professional liability endorsements. In the incidental malpractice endorsement, the parties used the term "bodily injury" and they expressly amended its definition; thus, the parties showed clearly that they intended to restrict the coverage provided by the incidental malpractice endorsement to bodily injury. In the laboratory endorsement on the other hand, the parties use the term "injury" without reference to the definition of bodily injury. "Injury" is not defined, or in any other way restricted, by the terms of the general liability policy. Moreover, the requirement of an "occurrence" causing "bodily injury" or "property damage" is contained in provision I of the general liability policy, which is the provision ostensibly amended to read instead as the laboratory endorsement reads.

■ F&C contends that the evidence introduced at trial shows that the parties intended to secure coverage only for injury to the subjects of IBT's tests. The witnesses all admitted that during the discussions which led to the adoption of the laboratory endorsement, they discussed the risk of injury to human test subjects at length. They also

agreed that they did not consider the possibility that IBT might fail to run tests altogether. However, the witnesses agreed that their discussions were never expressly limited to bodily injuries, and none of the correspondence regarding the laboratory endorsement limited the injuries under discussion to bodily injuries to humans and animals.

■■ ■ The witnesses also agreed that Nalco had expressed its desire to have broad professional liability coverage for IBT, parallel to architects' and engineers' liability coverage. Professional liability coverage for architects and engineers, often referred to as "errors and omissions" coverage, provides insurance principally for economic injury caused by the professional's failure to perform his contractual duties properly. (*Management Support Associates v. Union Indemnity Insurance Co.* (1984), 129 Ill. App. 3d 1089, 1093, 473 N.E.2d 405; 7A J. Appleman, Insurance Law and Practice sec. 4504.01 (Berdal ed. 1979).) Although F&C initially rejected Nalco's request for such coverage, Burns and Ross testified that Nalco continued to seek such coverage. In a letter dated 1977, Gilbert of F&C referred to the coverage provided by the laboratory endorsement as "Errors and Omissions [*sic*] coverage." Burns, Ross, and Bloom testified that they believed they had reached an agreement with F&C in 1972 that F&C was to provide such coverage by means of the laboratory endorsement, although Ross was never convinced that the laboratory endorsement provided that coverage. F&C had charged nothing for two previous endorsements which were clearly limited to medical malpractice liability. F&C charged $3,831 a year for the laboratory endorsement. The trial court found that in adopting the laboratory endorsement, the parties did not clearly intend to provide coverage restricted to bodily injury. We cannot say that the trial court's finding is clearly erroneous. (*Buttles v. Adkins* (1943), 318 Ill. App. 24, 31, 47 N.E.2d 516.) Thus, the laboratory endorsement on its face is broad enough to cover any injury, and the evidence did not show that the parties intended to restrict coverage to bodily injury. The trial court properly concluded that the laboratory endorsement is broad enough to cover any injury which arises from improper performance of IBT's tests.

■■ The witnesses agreed that prior to the adoption of the laboratory endorsement, they did not discuss coverage for IBT's failure to run tests it had contracted to run. F&C argues that if the endorsement provides coverage for such failures, it is in essence a guarantee of work performance. This court will not convert a contract for liability insurance into a performance bond. (*Management Support Associates v. Union Indemnity Insurance Co.* (1984), 129 Ill. App. 3d 1089, 1095, 473 N.E.2d 405.) The laboratory endorsement provides coverage for "the

rendering of or failure to render \*\*\* professional services *in the performance of* clinical-pathological examinations." (Emphasis added.) We believe that this language precludes coverage for liability arising out of the failure to perform the examinations at all: if there is no performance, liability cannot arise "in the performance." However, the laboratory endorsement provides coverage for the failure to render a service, such as adhering to proper testing procedures and accurately recording data, that is part of the performance of the test. Thus, our construction of the laboratory endorsement does not render it a performance bond.

In the complaints in all 11 of the suits filed against IBT and Nalco, the plaintiffs allege that they suffered economic damage due to IBT's failure to follow testing procedures properly and its failure to record data accurately when it performed certain tests. The plaintiffs also allege that IBT failed to perform tests altogether and it fraudulently reported inaccurate data from tests which were run and fictitious data for tests which were not run.

In Illinois law the insurer has a duty to defend a lawsuit which contains multiple claims as long as one of the claims "is within the coverage of a policy while the others may not be." (*Maryland Casualty Co. v. Peppers* (1976), 64 Ill. 2d 187, 194, 355 N.E.2d 24.) "The insurer can safely and justifiably refuse to defend only when the allegations *clearly* show on their face that the claim is beyond policy coverage." (Emphasis in original.) (*La Rotunda v. Royal Globe Insurance Co.* (1980), 87 Ill. App. 3d 446, 451, 408 N.E.2d 928.) In the instant case, the laboratory endorsement requires F&C to defend all suits in which at least one claim is based on IBT's improper performance of tests or improper recording of data, regardless of whether the claim sounds in negligence, breach of warranty, or breach of contract. (*Management Support Associates v. Union Indemnity Insurance Co.* (1984), 129 Ill. App. 3d 1089, 1096-97, 473 N.E.2d 405.) We find that all of the complaints contain such allegations.

Accordingly, we affirm the trial court's finding that F&C had a duty to defend these 11 suits. We remand for a determination of the effect of F&C's policy defenses, including fraud, and for a determination of any damages.

Affirmed and remanded.

McNAMARA, P.J., and RIZZI, J., concur.