FIDELITY AND CASUALTY COMPANY OF NEW YORK, Plaintiff and Counterdefendant-Appellant and Cross-Appellee, v. MOBAY CHEMICAL CORPORATION *et al.*, Defendants (Nalco Chemical Company, Defendant and Counterplaintiff; Industrial Bio-Test Laboratories, Inc., Defendant and Counterplaintiff-Appellee and Cross-Appellant; Nalco Chemical Company *et al.*, Third-Party Plaintiffs; Certain Underwriters at Lloyd's London (Group 1) *et al.*, Third-Party Defendants; Northbrook Excess and Surplus Insurance Company, Third-Party Defendant-Appellant).

First District (3rd Division)   Nos. 1—89—1307, 1—90—1715 cons.

Opinion filed December 30, 1992.—Modified on denial of
rehearing August 25, 1993.

Clausen, Miller, Gorman, Caffrey & Witous, P.C., of Chicago (James T. Ferrini, Frank L. Schneider, and Edward M. Kay, of counsel), for appellant Fidelity & Casualty Company of New York.

Mayer, Brown & Platt, of Chicago (Ronald A. Jacks, Steven R. Gilford, and Susan Kozik Jones, of counsel), for appellant Northbrook Excess and Surplus Insurance Company.

Lamet, Kanwit & Davis (Marsha K. Hoover and Stephen N. Landsman, of counsel) and Kevin M. Forde, both of Chicago, for appellee.

Kevin M. Forde, of Chicago, for Nalco Chemical Company.

PRESIDING JUSTICE TULLY delivered the opinion of the court:

This is the second time this case is presented to the court for review. In the first case, *Fidelity & Casualty Co. v. Nalco Chemical Co.* (1987), 155 Ill. App. 3d 730, 509 N.E.2d 446 (*Fidelity I*), Fidelity & Casualty Company of New York (F&C), the plaintiff-insurer, sued Nalco Chemical Company (Nalco) and Industrial Bio-Test Laboratories (IBT), the defendant-insureds, in a declaratory judgment action claiming that it had no duty to defend Nalco and IBT in 11 separate suits filed against them. In that appeal we affirmed the trial court's finding that F&C, under a laboratory endorsement added to Nalco's comprehensive general liability (CGL) policy, had a duty to defend the 11 suits filed against Nalco and IBT and "remand[ed] for a determination of the effect of F&C's policy defenses, including fraud, and for a determination of any damages." (*Fidelity*, 155 Ill. App. 3d at 740, 509 N.E.2d at 453.) As the facts of this case have already been set out in *Fidelity I*, we need not repeat them here again. Accordingly, we will set out only those additional facts which are pertinent to the issues presented in this appeal.

On remand, F&C sought to depose certain individuals relevant to its policy defense of fraud: Dr. Joseph Calandra; James Seamon; Dr. Donovan Gordon; and Merrill Thompson. Calandra is IBT's former president. Seamon is an investigator who probed IBT's activities. Gordon is a veterinarian and pathologist employed by IBT. Thompson is a Food and Drug Administration (FDA) expert who served as outside counsel for IBT until 1977.

Calandra, Seamon, and Gordon all were involved with studies that were the subject of a Federal criminal fraud prosecution. One such study, done for the Monsanto Company (Monsanto), was the subject of the criminal investigation but not of the underlying civil litigation against IBT and Nalco. F&C sought to explore IBT's allegedly fraudulent conduct as to the Monsanto study to determine whether there was an overall conspiracy to cheat and defraud IBT's customers.

During the Federal investigation of IBT, it agreed to waive its attorney-client and work product privileges with respect to the communications that Thompson had with IBT employees regarding studies IBT performed for the Syntex Corporation (Syntex) and Monsanto. Thompson later testified at the criminal trial of certain IBT officers. In turn for Thompson's testimony, Federal authorities did not seek indictment of IBT.

IBT moved to quash the deposition subpoena of Thompson citing attorney-client and work product privileges. In its order dated September 20, 1988, the trial court granted IBT's motion to quash the Thompson subpoena. In a separate order issued that day, the trial court also limited the discovery depositions of Calandra, Gordon, and Seamon to the studies which were the subjects of the underlying suits.

After the discovery motions had been ruled on by the trial court, IBT moved for summary judgment based on the estoppel doctrine. Invocation of the estoppel doctrine would prevent F&C from litigating policy defenses, including fraud. On December 20, 1988, following briefing, the trial court entered an order granting IBT's motion for summary judgment based on the estoppel doctrine. F&C then filed a motion to vacate the estoppel order which was denied by the trial court.

The trial court entered a judgment order against F&C in favor of IBT in the amount of $10,499,500 on April 28, 1989, *nunc pro tunc* as of April 26, 1989; that order also held: (1) F&C was obligated to indemnify IBT for the entire amounts of settlements made by IBT to third parties in connection with tests performed on or after January 1, 1973; (2) F&C was obligated to indemnify IBT for the entire amounts of settlements made by IBT to third parties in connection with tests performed both before and after January 1, 1973; (3) F&C had no obligation to indemnify IBT for settlements made by IBT to Syntex because all tests made by IBT for Syntex were performed prior to January 1, 1973; and (4) F&C was not obligated to pay IBT prejudgment interest from the dates of IBT's settlement of each of the underlying actions.

On appeal, F&C argues: (1) the trial court erred in invoking the estoppel doctrine, which prevented F&C from presenting its policy defenses, including fraud; (2) the trial court's quashing the Thompson subpoena and restricting the discovery depositions of the other individuals with potential knowledge of the fraud issue was error; (3) the trial court erred in holding the laboratory endorsement policy provided for an unlimited amount of liability coverage because the intent of the parties was to limit coverage to the aggregate amount of $300,000 per year; and (4) it cannot be held liable for settlements relating to occurrences outside of the policy.

Northbrook Excess and Surplus Insurance Company (Northbrook) joins F&C's appeal with respect to the second and fourth issues raised by it. Northbrook insured Nalco and IBT under an excess liability policy for the years January 1, 1974, to January 1, 1977. The Northbrook

coverage provided $25 million in the aggregate for each year. This excess policy also contained a so-called "following form endorsement."

On cross-appeal, IBT argues: (1) the trial court erred in excluding coverage for the Syntex litigations; and (2) the trial court erred by denying prejudgment interest on the settlement payments.

■ We first consider whether the trial court erred in invoking the estoppel doctrine, which prevented F&C from presenting its policy defenses, including fraud. However, before considering this issue specifically, we first examine whether the trial court followed the mandate of this court in *Fidelity I.* The mandate of an appellate court is its judgment which, upon transmittal to the trial court, revests that court with jurisdiction. Thereupon, a trial court must follow the specific directions of the appellate court's mandate to the letter to insure that its order or decree is in accord with the decision of the higher court. The trial court may only do those things directed in the mandate and has no authority to go beyond dictates of the mandate. (*P S L Realty Co. v. Granite Investment Co.* (1981), 86 Ill. 2d 291, 308-09, 427 N.E.2d 563, 571.) Furthermore, where directions are specific, a positive duty is placed on the trial court to enter an order or decree congruent with directions contained in the mandate. *Thomas v. Durchslag* (1951), 410 Ill. 363, 365, 102 N.E.2d 114, 115.

We find the directions of this court in *Fidelity I* were clear and specific: F&C was to be given an opportunity to raise its policy defenses, including fraud. Clearly, F&C was not permitted to do so. Accordingly, we find the trial court violated the mandate of this court and erred in granting IBT's motion for summary judgment to IBT which estopped F&C from presenting available policy defenses.

In the alternative, we hold that it was error, for the reasons discussed below, for the trial court to apply the estoppel doctrine against F&C.

■ As a general rule, an insurer has a duty to defend a lawsuit which contains multiple claims so long as one of the claims alleges facts within the coverage of the policy. An insurer can justifiably and safely refuse to defend a lawsuit only when the allegations of the complaint clearly show on their face that a claim is beyond the policy's coverage. (*Fidelity*, 155 Ill. App. 3d at 740, 509 N.E.2d at 452.) When an insurer wrongfully refuses to defend a complaint which alleges facts within the policy's coverage, it is liable to the insured for breach of contract. The measure of damages for such a contractual breach is generally the amount of the judgment against the insured, plus any expenses incurred. *Thornton v. Paul* (1978), 74 Ill. 2d 132, 144-45, 384 N.E.2d 335, 340.

■ One effect of an insurer's wrongful failure to defend a lawsuit is to estop the insurer from later raising policy defenses or noncoverage in a subsequent action by the insured or by a judgment creditor in garnishment. (*Thornton*, 74 Ill. 2d at 145, 384 N.E.2d at 340; see also *Palmer v. Sunberg* (1966), 71 Ill. App. 2d 22, 217 N.E.2d 463; *Sims v. Illinois National Casualty Co.* (1963), 43 Ill. App. 2d 184, 193 N.E.2d 123.) If there is doubt as to whether or not an insurer must defend a suit, the insurer should defend under a reservation of rights or seek a declaratory judgment. (*Sims*, 43 Ill. App. 2d at 199, 193 N.E.2d at 130.) However, this rule does not apply in a situation where, by defending the insured's case, the insurer would place itself in a conflict of interest with the insured. *Thornton*, 74 Ill. 2d at 162, 384 N.E.2d at 348.

In *Thornton*, the Illinois Supreme Court carved out an exception to the estoppel rule where there is a conflict of interest between the insurer and the insured. In the underlying action in *Thornton*, there were claims of assault, battery, and negligence alleged against the defendant-insured. If the insurer would have accepted the defense of the underlying suit, it would have had the right to control the defense of the case. Thus, the insurer's interest did not necessarily lie in a finding of no guilt, but would have been equally or better served by a finding that the defendant-insured committed a battery upon the plaintiff in the underlying action which would vitiate coverage.

Our supreme court, in *Thornton*, distinguished the conflict situation in that case from the holding of *Sims* and discussed the inapplicability of *Sims'* first suggestion, that the insurer defend under a reservation of rights, when it stated:

> "These suggestions do not, in the peculiar factual situation of this case, resolve the dilemma. It is only when the insurer defends under a reservation of rights that the conflict of interests becomes apparent. If the insurer defends without reserving its rights, it waives its policy defenses, and is liable for the judgment whether or not the insured's conduct falls within the coverage of the policy. [Citation.] In a conflict situation such as is presented in this case, defending under a reservation of rights, assuming such a conditional defense is acceptable to the insured, does not solve the ethical question because the insurer's interests would be promoted by a finding that the insured had committed a battery. Since the right to assert policy defenses had been reserved, such a finding would relieve the insurer from its obligation to pay and at the same time impose liability

upon the insured." *Thornton*, 74 Ill. 2d at 156, 384 N.E.2d at 345.

As to *Sims'* suggestion that the insurer seek a declaratory judgment as to its obligations, the *Thornton* court stated:

"[I]n addition to the undesirability of forcing an insurer into a conflict of interests position through the use of the declaratory judgment action[,] *** in situations such as are present in this case, a declaration in a declaratory judgment action whether or not the insured's conduct constituted a battery would be premature. In a declaratory judgment action, injured claimants are proper and necessary parties and the judgment in such an action is binding under the doctrine of collateral estoppel as to the facts determined by the judgment and would preclude parties to the action from relitigating them. [Citation.]

In a declaratory judgment action the ultimate question of the insured's liability to the injured party is not the issue before the court. However, if a court were to determine in a declaratory judgment action that the insured's conduct did not come within the coverage of the policy because it constituted a battery, this declaration would be binding on the insured in the personal injury action between the injured party and the insured, and would in all probability be determinative of the issue of liability in that suit." *Thornton*, 74 Ill. 2d at 157, 384 N.E.2d at 345.

■ In this case, we find that a conflict of interest, similar to that which existed in *Thornton*, was present between F&C and its insureds. A finding in the underlying suits that IBT had fraudulently reported inaccurate data from tests which were run and fictitious data for tests which were not run would establish fraud and, consequently, vitiate coverage. Thus, it would be in F&C's interest for a court in one of the underlying actions to find IBT guilty of fraud. *Thornton* clearly states that under these circumstances F&C cannot be estopped from raising its policy defenses because it did not file and pursue a declaratory judgment prior to the resolution of the underlying claims. Moreover, we find the prosecution of such an action by F&C would have been premature until the underlying litigation was resolved.

However, nothing in our decision in this appeal in any way disturbs our holding in *Fidelity I* that F&C had a duty to defend all of the underlying suits. F&C remains liable on its obligation to reimburse IBT for the defense costs IBT incurred in defending the underlying actions.

■ We next consider F&C's argument that the trial court abused its discretion in quashing the deposition subpoena of Thompson and restricting the discovery depositions of Calandra, Seamon, and Gordon.

IBT claims that its communications with Thompson are protected by the attorney-client privilege and that the waiver it made of such privilege was strictly limited, by agreement with the United States Attorney, to the government's criminal investigation and prosecution of certain IBT officers in exchange for no indictment being sought against IBT. (See *United States v. Keplinger* (7th Cir. 1985), 776 F.2d 678.) F&C argues that IBT irrevocably waived its privilege during that proceeding and cannot now seek to resurrect it as a shield against F&C in this proceeding. This is an issue of first impression in Illinois.

IBT relied upon *Teachers Insurance & Annuity Association of America v. Shamrock Broadcasting Co.* (S.D.N.Y. 1981), 521 F. Supp. 638, before the trial court as authority to sustain its motion to quash the subpoena. *Teachers Insurance* held that in the context of investigations by the Securities and Exchange Commission, there can be a limited waiver provided the right to assert the privilege in subsequent proceedings is specifically reserved at the time the disclosure is made. The policy behind such a rule is to encourage and facilitate cooperation with government investigations.

However, the *Teachers Insurance* decision has not gone unmet by criticism. In *Maryville Academy v. Loeb Rhoades & Co.* (N.D. Ill. 1982), 559 F. Supp. 7, Judge Getzendanner of the United States District Court for the Northern District of Illinois specifically rejected the holding of *Teachers Insurance* when she held:

> "Such a rule still would permit clients to pick and choose those to whom disclosure could be made without incurring the penalty of loss of the privilege.
>
> I agree with the opinion in [*Permian Corp. v. United States* (D.C. Cir. 1981), 665 F.2d 1214, 1222], that 'the attorney-client privilege should be available only at the traditional price: a litigant who wishes to assert confidentiality must maintain genuine confidentiality.' " *Maryville Academy*, 559 F. Supp. at 9.

Moreover, the attorney-client privilege exists to protect and maintain confidential communications between the lawyer and the client and, thus, protect the attorney-client relationship itself. (See E. Cleary, McCormick on Evidence §87 (3d ed. 1984).) Any disclosure by the client is inherently inconsistent with the policy of facilitating a confidential attorney-client relationship and, therefore, must result in

a waiver of the privilege. We believe this result is especially compelling in a situation such as in the case at hand where IBT used the privilege as a bargaining chip to escape indictment and criminal liability.

Accordingly, we find that IBT waived its attorney-client privilege and that F&C had a right to depose Thompson regarding IBT's conduct and, therefore, the trial court erred in quashing the deposition subpoena.

■■ With regard to the trial court's restricting the discovery depositions of Calandra, Seamon, and Gordon, Illinois Supreme Court Rule 201 places the threshold of discovery on the term "relevant." Any matter relevant to the subject matter involved in the pending action is permitted under Supreme Court Rule 201(b)(1). (134 Ill. 2d R. 201(b)(1); *M. Loeb Corp. v. Brychek* (1981), 98 Ill. App. 3d 1122, 1125, 424 N.E.2d 1193, 1196-97.) Although a trial court has broad discretionary powers relative to discovery matters, orders restricting discovery will be reversed as an abuse of discretion when such rulings prevent the ascertainment of truth or substantially affect an issue in a case. *United Nuclear Corp. v. Energy Conversion Devices, Inc.* (1982), 110 Ill. App. 3d 88, 104-05, 441 N.E.2d 1163, 1174.

We find the trial court abused its discretion in restricting F&C's discovery as to Calandra, Seamon, and Gordon regarding the tests in the underlying actions. The misconduct in performing the Monsanto study is surely relevant to the allegation that IBT engaged in an overall scheme to defraud the underlying claimants. Such a scheme, if proven, would clearly vitiate coverage.

We now turn to F&C's argument that the trial court erred in holding that the laboratory endorsement provided for an unlimited amount of liability coverage because it was the intent of the parties to limit coverage to an aggregate amount of $300,000 per year as provided for in the underlying policy.

The laboratory endorsement, which amends provision I of Nalco's CGL policy, contains the following pertinent language:

> "The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of: (a) injury arising out of the rendering of or failure to render, during the policy period, professional services in the performance of clinical-pathological examinations and services *** *but the company shall not be obligated to pay any claim or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements."* (Emphasis added.)

Provision I of the CGL policy provides, in pertinent part:

"The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of

A. bodily injury or

B. property damage

to which this insurance applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or judgment as it deems expedient, *but the company shall not be obligated to pay any claim or judgment or defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.*" (Emphasis added.)

Provision III, entitled "LIMITS OF LIABILITY," describes the policy's limits of liability for bodily and property damage, and in an accompanying schedule, the limits for "bodily injury liability" are listed as $300,000 per person, $300,000 per each occurrence, and $300,000 in the aggregate. The policy further provides property damage liability coverage of $100,000 per each occurrence, and $100,000 in the aggregate.

■■■ "Indorsements, riders, marginal references, and other writings which constitute a part of the contract of insurance are to be read and construed with the policy proper. *** An indorsement is not to be construed more broadly than the fair import of its terms considered in connection with the whole of the policy." (2 Couch on Insurance 2d §15:30 (1983); see also *Metro Inter-Insurance Exchange v. Anthony* (1971), 1 Ill. App. 3d 612, 275 N.E.2d 296; *Robert L. Berner Co. v. National Fire Insurance Co.* (1947), 331 Ill. App. 102, 72 N.E.2d 727; *Hoffman v. Central Surety & Insurance Corp.* (1938), 297 Ill. App. 371, 17 N.E.2d 619.) Clearly, the laboratory endorsement contains explicit and unambiguous language referencing coverage limits. As the laboratory endorsement itself does not contain any coverage limitations and is bereft of language providing for unlimited coverage, it is only reasonable to turn to the underlying policy and construe the endorsement with the whole of the policy and apply the coverage limitations contained therein. Moreover, we believe that the fact that the laboratory endorsement uses the exact same language regarding policy limits as provision I, emphasized in both above, evinces the intent of the parties to have the policy limits in effect

with respect to the endorsement. Accordingly, the amount of F&C's liability, under the laboratory endorsement, if proven, is limited to the amount of $300,000 per in the aggregate. Consequently, we find error in the trial court's judgment that the laboratory endorsement provided an unlimited amount of liability insurance.

■ We next consider whether an insurer can be held liable for settlements relating to occurrences outside the policy. It is well settled that an insured is only entitled to indemnity for losses that fall within the terms of its policy. (*Miner v. Bray* (1987), 160 Ill. App. 3d 241, 513 N.E.2d 580; *St. Michael's Orthodox Catholic Church v. Preferred Risk Mutual Insurance* (1986), 146 Ill. App. 3d 107, 496 N.E.2d 1176; *Polzin v. Phoenix of Hartford Insurance Cos.* (1972), 5 Ill. App. 3d 84, 283 N.E.2d 324.) Whether a loss falls within the terms of the policy is determined not only by analyzing whether the type of loss is covered by the policy, but also by determining whether the loss falls within the effective dates of coverage. *St. Michael's*, 146 Ill. App. 3d at 109-10, 396 N.E.2d at 1179.

The case of *St. Michael's* is instructive. In *St. Michael's*, the dispute involved an insurance claim pertaining to water damage caused by a leaking roof, which had started leaking prior to the effective date of coverage. The court held that the insurer was required to indemnify the insured only with respect to that portion of the loss which occurred after the effective date of the policy and not for all the damage caused by the leak.

Northbrook directs our attention to the holding of the supreme court of Minnesota in *Jostens, Inc. v. C N A Insurance/Continental Casualty Co.* (Minn. 1987), 403 N.W.2d 625, for the principle that the *St. Michael's* rule is applicable to the settlements of suits. Thus, where only part of a settlement relates to occurrences within the policy period, the settlement must be apportioned by determining which occurrences fell within the period of coverage. See also *Keller Industries, Inc. v. Employers Mutual Liability Insurance Co.* (Fla. App. 1983), 429 So. 2d 779.

In *Jostens*, the insured settled a class action sex discrimination suit against itself and sought indemnification from its insurer, although some of the discriminatory acts that occurred preceded policy coverage. The insurer breached its duty to defend the insured in the underlying action. In reversing the trial and appellate courts, the Minnesota Supreme Court held that although there was a duty to indemnify, the insurer was liable only for that portion of the settlement which related to the discrimination and its ramifications which occurred within the policy period.

We believe the reasoning of *Jostens* is applicable to the case at hand and find that the trial court did not err in holding that F&C could not be held liable for the Syntex settlement, but did err in failing to apportion the settlements which occurred before and during the coverage period. We cannot believe that Nalco and F&C bargained for or intended to create a policy which would cover Nalco and IBT prior to the initiation of the policy on January 1, 1973.

On remand, it will be the burden of IBT and Nalco to establish how its settlements relate to the periods in which coverage was available. In addition to being entitled to reimbursement of only that portion of a settlement relating to acts covered by the insurance policy, Nalco and IBT bear the burden of establishing which tests fall within the terms of the policy. *Miner*, 160 Ill. App. 3d at 244, 513 N.E.2d at 582; *St. Michael's*, 146 Ill. App. 3d at 109, 496 N.E.2d at 1178.

The second issue raised on cross-appeal by IBT, that the trial court erred by denying prejudgment interest on the settlement payments, is mooted by our disposition of the other issues in this appeal.

Thus, in summary, we reverse and vacate that part of the judgment order of the trial court entering judgment for IBT and estopping F&C from asserting policy exclusions, defenses, and noncoverage and remand for a hearing to make a determination of the effect of F&C's policy defenses, including fraud. We vacate the orders quashing the deposition subpoena of Thompson and restricting the scope of discovery as to Calandra, Seamon, and Gordon. We vacate that part of the judgment order finding F&C liable to reimburse fully IBT for all tests which partially fell into the term of coverage and remand for a hearing to make an apportionment of the settlements should IBT prove F&C liable to it on the policy. We affirm that part of the trial court's judgment order that holds F&C cannot be held liable for the Syntex litigation.

Affirmed in part; and vacated in part; and reversed in part and remanded.

RIZZI and GREIMAN, JJ., concur.