*In re* GRAND JURY JANUARY 246

First District (3rd Division)    No. 1—95—0631

Opinion filed June 7, 1995.

GREIMAN, P.J., dissenting.

Jones & Walls, of Chicago (Vincent Jones and LaCoulton J. Walls, of counsel), appellants *pro se.*

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Marie Quinlivan Czech, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CERDA delivered the opinion of the court:

Defendant attorneys, Vincent Jones and LaCoulton Walls (the contemnors), appeal the trial court's order finding them in direct contempt of court because they refused to testify before the grand jury about a conversation they had with a former client. Pending the outcome of this appeal, the imposition of the contemnors' sentences has been stayed.

The facts are not in dispute. From October 1994 to December 28, 1994, the contemnors represented Beverly Heard, who had previously alleged and then recanted charges that she had had a sexual relationship with United States Congressman Mel Reynolds when she was 16 years old.

On June 2, 1994, Ms. Heard contacted the State Attorney's office, reported that she met Congressman Reynolds when she was 16 years old, and had a sexual relationship with him. As a result of those allegations, Congressman Reynolds was charged with criminal sexual abuse (720 ILCS 5/12—15 (West 1992)) and child pornography (720 ILCS 5/11—20.1 (West 1992)).

Ms. Heard then recanted her allegations against Mr. Reynolds in

three separate written affidavits. On June 15, 1994, Ms. Heard issued a one-sentence, written affidavit stating that she was "withdraw[ing] from any further investigation or prosecution of Mr. Mel Reynolds." Later, on June 21, 1994, Ms. Heard issued another written affidavit withdrawing "any of [her] previous statements that Mel Reynolds and [she] had sexual intercourse when [she] was 16 years old." Subsequently, on June 26, 1994, Ms. Heard issued a third written affidavit, two pages in length, in which she again recanted her previous allegations against Mr. Reynolds.

On June 28, 1994, and July 5, 1994, Ms. Heard testified before the grand jury. She restated the same information that she had previously told to the police and the State's Attorney but also stated that the recantations in the three affidavits were true.

Thereafter, Ms. Heard issued a court-reported deposition dated December 28, 1994, in which she recanted her allegations against Mr. Reynolds. In the deposition, Ms. Heard gave the following testimony about her former attorneys, the contemnors:

"Q. And when you returned from Cleveland, did you have a conversation with the State's Attorney or police department?

A. Yes, I did actually.

Q. Do you recall when and where that took place?

A. Well, this was at Jones and Walls' office. I spoke with Andrea Zopp and Neal Goodfriend.

Q. And who was [sic] Jones and Walls?

A. Jones and Walls were my attorneys at that time.

Q. These were different attorneys that were representing you at that particular time?

A. Right.

Q. And when you spoke with Andrea Zopp and Neal Goodfriend at the office of Jones and Walls, do you remember the context of the conversation?

A. Well, they were just telling me how they have got him. They've got Mel and how they felt that I did a real good job on the telephone conversations and asked me did I have any questions or anything like that. And they were talking about other things, but they were sort of talking amongst themselves. They didn't have anything much to do with me.

Q. When you spoke with the attorneys at Jones and Walls about representing you, did you talk with them in terms of in what context they would represent you?

A. Yes. They told me that they would do anything that I want to do, and I told them about I want to leave the investigation alone.

Q. What was their response?

A. Really, they didn't want to get caught up in the power struggle between the assistant State's Attorney's office and the indictment of Mel Reynolds. They really didn't want to get involved with that.

Q. Did they agree to represent you in any other matters?

A. No. Wait, but they did mention something about movies, no, actually books.

Q. There was some discussion?

A. Right, there was.

Q. Do you remember who initiated the discussion about books?

A. Well, they were saying, you know, maybe it was time I got— They said something about Mel. Anyway Mel would end up paying for all of the things he did to me or something like that, something to that extent.

Q. There was some indication that there might be some financial benefit to you?

A. Oh, yeah, that's what they were talking about, financial benefits, exactly.

Q. Do you recall approximately when it was that you had the conversation with Neal Goodfriend and Andrea Zopp at the Jones and Walls office?

A. No, I can't remember. I believe it was maybe about two months.

Q. Approximately two months prior to today's date?

A. Yes.

Q. So it would have been some time the end of October or something?

A. Maybe mid October, yeah, something like that."

A transcript of this deposition was provided to and published by the media.

On January 13, 1995, the State filed a motion to obtain subpoenas and compel the testimony of contemnors. In its motion, the State contended that the evidence sought from the contemnors would show "that Beverly Heard told her former attorneys Walls and Jones that she had met with the representatives of Mel Reynolds and had been offered $100,000 to change her testimony."

In a hearing held on January 23, 1995, the trial court ruled that the deposition testimony operated to "waive the privilege as it might relate to anything that involved money coming to or potentially coming to Ms. Heard, legally or illegally."

In a hearing on January 31, 1995, the court stated that it was informed that there were three conversations between Ms. Heard and the contemnors. During two separate conversations, financial matters were discussed. During another separate conversation,

representatives from the State's Attorney's office were also present for a portion of the discussion. The trial court rejected the contemnors' position that Ms. Heard's deposition testimony referred to only one conversation in which financial matters were discussed and not both. The trial court ruled that Ms. Heard's deposition answer was so broad that she waived her privilege to any discussion of money. The trial court further found that the crime-fraud exception to the attorney-client privilege would apply.

On January 31, 1995, the trial court entered an order allowing the State to issue grand jury subpoenas to the contemnors and finding that Ms. Heard voluntarily waived her attorney-client privilege, in relevant part, to "[c]onversations concerning money and financial benefits that may or may not have flowed to Beverly Heard legally or illegally as a result of the investigation or its termination."

On February 1, 1995, pursuant to subpoenas, the contemnors appeared before the grand jury but refused to testify about the financial matters stated in the trial court's order of January 31. The following exchange occurred at the grand jury hearing:

"QUESTION: I would like to ask you that during one of the phone calls that you had with your client, did your client indicate to you that she, in fact, had been contacted either by Mel Reynolds or representatives of Mel Reynolds about receiving a financial sum, that being approximately 100,000 dollars, to not continue in this matter?

ANSWER: I refuse to answer this question.

QUESTION: And the basis for your refusal to answer that question, is that because of—because you're invoking your former client's attorney-client privilege; is that correct?

ANSWER: That's correct."

On February 14 and 17, 1995, two hearings were held on the State's motion to show why the contemnors should not be held in contempt. On February 14, the matter remained undecided and was continued. On February 17, the trial court, with the parties' consent, allowed an *ex parte* disclosure by contemnors of the substance and time of the questioned conversation. The trial court accepted as true that "the conversations happened at two separate occasions," referring to the "book/movie conversation" and the "$100,000 conversation." If the "$100,000 conversation" referred to legitimate matters, the trial court stated, waiver applied since Ms. Heard testified to financial matters in her deposition. If, however, the "$100,000 conversation" referred to illegitimate matters, the conversation should be disclosed under the crime-fraud exception to the attorney-client privilege. The court then held the contemnors in contempt of

court and stayed the imposition of their sentences pending the outcome of this appeal.

There is no dispute that (1) the attorney-client privilege applied to conversations between the contemnors and their former client; and (2) the former client waived the privilege as to all matters revealed in her deposition testimony. Thus, the limited inquiry presented on appeal is the extent of the client's waiver. The contemnors urge this court to take a very narrow view of the revelations made in Ms. Heard's deposition while the State invites a broad reading of Ms. Heard's testimony.

Although contemnors acknowledge that Ms. Heard waived her right to withhold information relating to matters revealed in her deposition, they assert that the "$100,000 conversation" was not revealed in her deposition. Instead, contemnors argue that only the "book/movie conversation" was revealed in the deposition. Since the two conversations occurred separately, contemnors maintain that the "$100,000 conversation" remains within the protection of the attorney-client privilege.

The State contends that Ms. Heard's public reference, via her deposition testimony, to receiving "financial benefits" from Congressman Reynolds waived the attorney-client privilege as it related to all her communications with contemnors about money she may have been offered from Reynolds. The State specifically argues that Ms. Heard's deposition testimony about her discussions with contemnors concerning "financial benefits" was not restricted to movie and book deals but was broad enough to encompass any and all discussions concerning financial benefits which she would receive from Congressman Reynolds.

■ We agree with the State. The attorney-client privilege is an "evidentiary privilege [which] provides limited protection to communications from the client by prohibiting their unauthorized disclosure in judicial proceedings." (*In re Marriage of Decker* (1992), 153 Ill. 2d 298, 312, 606 N.E.2d 1094.) The definition and application of the attorney-client privilege have been explained as follows: (1) where legal advice of any kind is sought; (2) from a professional legal adviser in his capacity as such; (3) the communications relating to that purpose; (4) made in confidence; (5) by the client; (6) are at his instance permanently protected; (7) from disclosure by himself or by the legal adviser; (8) except the protection may be waived. *People v. Adam* (1972), 51 Ill. 2d 46, 48, 280 N.E.2d 205.

■ The purpose of the attorney-client privilege "is to enable a person to consult freely and openly with an attorney without any fear of compelled disclosure of the information communicated."

(*Decker*, 153 Ill. 2d at 312-13.) However, the client may waive this privilege when he or she voluntarily discloses the privileged information. (*Decker*, 153 Ill. 2d at 313; *In re Estate of Hoover* (1992), 226 Ill. App. 3d 422, 431, 589 N.E.2d 899; *Rapps v. Keldermans* (1993), 257 Ill. App. 3d 205, 628 N.E.2d 818; *Fidelity & Casualty Co. v. Mobay Chemical Corp.* (1992), 252 Ill. App. 3d 992, 625 N.E.2d 151; *Newton v. Meissner* (1979), 76 Ill. App. 3d 479, 394 N.E.2d 1241.) By Ms. Heard giving the deposition and then making it public, it was not confidential.

■ Although voluntary disclosure of confidential information does not effectively waive an attorney-client privilege as to all other nondisclosed communications that may have taken place (*In re Estate of Hoover* (1992), 226 Ill. App. 3d 422, 431, 589 N.E.2d 899), where a client reveals portions of her conversation with her attorney, those revelations amount to a waiver of the attorney-client privilege as to the remainder of the conversation or communication about the same subject matter. *People v. O'Banner* (1991), 215 Ill. App. 3d 778, 793, 575 N.E.2d 1261.

Consequently, we find that Ms. Heard's statements included any and all conversations about financial benefits she would receive from Mr. Reynolds. The following statements were made by Ms. Heard:

"A. Well, they were saying, you know, maybe it was time I got— They said something about Mel. Anyway Mel would end up paying for all of the things he did to me or something like that, something to that extent.

Q. There was some indication that there might be some financial benefit to you?

A. Oh, yeah, that's what they were talking about, financial benefits, exactly."

Ms. Heard's statements were so broad that they encompassed all discussions she had with contemnors involving any financial benefits, either legal or illegal, that she received from Reynolds. As a result, contemnors cannot use the attorney-client privilege to refuse to answer the grand jury's questions relating to that subject matter.

Because we have ruled that the attorney-client privilege was waived, we do not need to discuss the crime-fraud exception to the attorney-client privilege.

Accordingly, we affirm the circuit court's judgment.

Affirmed.

RIZZI, J., concurs.

998

PRESIDING JUSTICE GREIMAN, dissenting:

I must respectfully dissent from the majority decision because I believe that the deposition testimony at issue cannot and, indeed, should not be read so broadly as to waive the attorney-client privilege which protects other aspects of conversations and other conversations.

The supreme court has recently reminded us of the policy behind the privilege. "The *raison d'etre* of the privilege is to secure for the client the ability to confide freely and fully in his or her attorney, without fear that confidential information will be disseminated to others." *People v. Knuckles* (1995), 165 Ill. 2d 125, 130.

The voluntary disclosure of confidential information does not waive the attorney-client privilege as to all conversations or as to the entire discussion which may have occurred (*Goldman, Sachs & Co. v. Blondis* (N.D. Ill. 1976), 412 F. Supp. 286, 288), and a partial waiver of the privilege as to certain communications does not constitute a blanket waiver as to undisclosed conversations (*In re Estate of Hoover* (1992), 226 Ill. App. 3d 422, 431, 589 N.E.2d 899). The parameters of a client's waiver "extend[ ] no further than the subject matter concerning which testimony had been given by the client." (*People v. Gerold* (1914), 265 Ill. 448, 481, 107 N.E. 165.) Moreover, to determine the extent of disclosure where a partial disclosure has been made, reference must be made to the objectives of the attorney-client privilege and the qualification (*Blondis*, 412 F. Supp. at 288) and a careful examination must be made of the words allegedly waiving the privilege.

Of the several cases cited by the majority, none is factually parallel to the case at bar. While the general principles ascribed to the cited authority are valid, they are not applicable to the facts which we consider here. For example, although the majority relies heavily upon *In re Marriage of Decker* (1992), 153 Ill. 2d 298, 312, 606 N.E.2d 1094, that case was a crime-fraud case rather than a waiver (a kidnapping parent told a lawyer that she was leaving the jurisdiction with the child). Similarly, *Fidelity & Casualty Co. v. Mobay Chemical Corp.* (1992), 252 Ill. App. 3d 992, 625 N.E.2d 151, dealt with a full waiver of the conversation with the lawyer where the defendant used the entire conversation with counsel in an effort to secure a bargaining chip in the course of a Federal prosecution.

Examples of such inapplicability are: (1) the defendant's testimony supporting a claim of incompetency of counsel was deemed a waiver of the privilege as to matters discussed between attorney and client in fashioning a defense strategy (*People v. O'Banner* (1991), 215 Ill. App. 3d 778, 575 N.E.2d 1261); (2) the plaintiff's statement that she told her attorney that she had no independent recollection

of the accident opened the door for the attorney to testify as to this impeaching matter (*Newton v. Meissner* (1979), 76 Ill. App. 3d 479, 394 N.E.2d 1241); (3) a statement to an insurance investigator employed by the lawyer and who the client believes represents the lawyer is privileged (*Rapps v. Keldermans* (1993), 257 Ill. App. 3d 205, 628 N.E.2d 818); and (4) the entire conversation held in an automobile on the way to court was waived where the client testified to all of the conversation before the grand jury after a grant of immunity (*People v. Adam* (1972), 51 Ill. 2d 46, 280 N.E.2d 205). None of these cases involve a part of a conversation or a different conversation from that which is the subject of the inquiry. These cases relate to complete disclosure of the subject conversations.

On the other hand, one of the cited cases appears to support the contemnors' position. In *In re Estate of Hoover* (1992), 226 Ill. App. 3d 422, 431, 589 N.E.2d 899, the court held that the voluntary disclosure of information by the client does not effectively waive the attorney-client privilege as to all other nondisclosed communications which may have taken place.

Upon close examination of the December 1994 deposition, it seems rather clear that it refers to the initial interview Ms. Heard had with contemnors. However, the question put to the attorneys concerns a specific telephone conversation subsequent to their initial engagement.

We have already stated that waiver of one conversation does not waive all other conversations between client and attorney. Even Ms. Heard's words do not allow the conclusion that a Reynolds offer was discussed. She mentions discussion of what she might be entitled to "for all of the things he did to me" not "what I might do for him." Aside from the mention of books and movies, about the best that can be made of her remarks is that she believed that she had some sort of claim against Reynolds.

In light of these principles, I do not believe that the phrase "financial benefits" as used in Ms. Heard's deposition can be read or construed to have broken the privilege barrier beyond the context of books or movies. The sanctity and shelter of the attorney-client privilege must not be diluted by an over expansive interpretation of partial revelations and is better protected by a narrow view of disclosure.