*1109
 
 OPINION
 

 Per Curiam:
 

 On August 12, 1992, eighteen-year-old Damon Lamonte Davis was certified as an adult for crimes committed prior to his eighteenth birthday. After pleading not guilty, Davis was tried by a jury and convicted of three counts of robbery with use of a deadly weapon, one count of first-degree kidnapping with use of a deadly weapon, one count of burglary, one count of battery with intent to commit a crime, two counts of assault with a deadly weapon, and one count of discharging a firearm from a motor vehicle. Davis was sentenced to two consecutive life terms for the kidnapping with a deadly weapon charge, and to various, mainly concurrent, fifteen, six and four year terms on the remaining charges.
 

 The convictions which Davis contests herein arose out of criminal conduct involving two victims, Wendy Dombrowski and Michael R. Sanchez. We conclude that Davis was fairly tried and convicted with respect to the Dombrowski crimes, but that his convictions stemming from the Sanchez events must be vacated and dismissed with prejudice.
 

 FACTS
 

 The evidence presented at trial concerned three different incidents, only two of which form the basis for Davis’s assignments of error on appeal.
 

 The Dombrowski Incident
 
 formed the basis for one of the
 
 *1110
 
 counts of robbery with use of a deadly weapon and the count of first-degree kidnapping with use of a deadly weapon.
 

 The victim, Wendy Dombrowski, testified that at 8:15 p.m. on the evening of March 24, 1992, she had just pulled into the driveway of her Las Vegas home when she was accosted by an unknown assailant whom she identified at trial as Davis. The assailant pointed a gun at Dombrowski’s face and demanded that she give him her purse; Dombrowski complied. The victim’s wallet contained $40.00 and an ATM card, which prompted Davis to order Dombrowski to drive him to her bank, threatening to kill her if she disobeyed. With Davis’s gun poking her in the side, Dombrowski drove to a nearby bank, removed $500.00 from the ATM and handed the cash to Davis. After the machine denied further withdrawals, Davis instructed Dombrowski to drive back to her home, stating that there better be some money there. When the two arrived at the victim’s house, Dombrowski noticed a nearby car flash its lights. Davis told Dombrowski not to call police since he knew where she lived and would return and kill her. Davis then ran towards the car that had flashed its lights as Dombrowski ran into her home, locked the door, and called 911.
 

 Dombrowski described Davis’s gun as a dark-coal colored automatic, and testified that because of the manner in which he carried it, and because she could feel its coldness and weight through her t-shirt, she did not believe it to be made out of plastic. Although Dombrowski testified that she saw that the gun was of metal construction, she admitted on cross-examination that she could not testify that she knew it was a real gun. On redirect, however, she stated she had never described the gun as plastic and that at one point, the gun made a noise like a bullet being placed in the chamber.
 

 Defense counsel stipulated that a positive match was made between Davis’s fingerprints and those found on the vehicle used in the kidnapping. Metro Detective Michael T. Karstedt testified that he had interviewed Davis regarding this incident after the fingerprint analysis and a photo line-up indicated that he was a suspect. After being informed of his
 
 Miranda
 
 rights, Davis admitted being the perpetrator, but stated that he had committed the crime with a BB gun, rather than a real gun. No gun was ever recovered.
 

 Davis took the witness stand on his own behalf and corroborated Dombrowski’s version of the events, including his threats to kill her, but testified that the gun he used was a plastic toy. gun which only shot soft rubber BB-size balls. Davis’s mother testified that there were several toy guns in her home, as she had nine grandchildren. Davis’s girlfriend testified that she had seen Davis
 
 *1111
 
 with “one of them little K-Mart toy guns [that] shot .... [ljittle red circle caps.”
 

 The Sanchez Incident
 
 resulted in a charge of two counts of robbery with use of a deadly weapon, one count of burglary, and one count of battery with intent to commit a crime.
 

 The victim, Michael R. Sanchez, testified that at approximately 8:45 p.m. on the evening of April 15, 1992, as he pulled into his garage and was exiting his car, he was hit in the face by an unknown intruder. At trial, Sanchez identified Davis as his assailant. Davis was with another individual, who had a small gun that “looked like a .380.” Both individuals demanded money and Sanchez complied by giving Davis the $6.00 he had in his pocket. The pair then asked for a bank card, and Sanchez replied that he did not have one, but that his wife did. The intruders then required that he go into the house with them to retrieve it. Sanchez led the pair into his home, where his wife and two children were present. The perpetrator with Davis waived his gun at Sanchez and threatened to shoot him. Sanchez secured his wife’s purse, giving it to the individual with the gun, who in turn handed it to Davis. The pair then informed Sanchez that they were all going to the bank and accompanied Sanchez back to the garage. Sanchez’s wife went to the door of the garage and told her husband to let them take the purse and the truck, but not to accompany them. For some reason, the two men gave up their plan of taking Sanchez to the bank and left with the $36.00 they had taken from Sanchez and his wife.
 

 Sanchez positively identified Davis at trial and indicated that he had earlier picked him out of a photographic line-up. Mrs. Sanchez likewise testified that she had picked Davis out of a photographic line-up and that she had no doubt whatsoever concerning her identification of Davis.
 

 Davis testified that he was not involved in this incident, and that on the evening in question, he was with his girlfriend Anyana and her son watching movies on the occasion of the birthday of Anyana’s friend, Jessica. Davis also claimed that he had recently hurt his knee at a basketball tournament and really could not function. The fact that Davis’s knee was injured while he was at the tournament was corroborated by his coach, his mother, his girlfriend Anyana, and her friend Jessica. Seventeen-year-old Anyana Swan, who testified that she was Davis’s girlfriend and the mother of their nine-month-old child, stated that Davis was with her at Jessica’s house for Jessica’s birthday on the evening of April 15, 1992, watching movies. Jessica corroborated Anyana’s testimony.
 

 The jury also heard evidence of a third criminal incident involving Davis which resulted in his conviction for two counts
 
 *1112
 
 of assault with a deadly weapon and one count of discharging a firearm from a motor vehicle. However, none of Davis’s assignments of error on appeal relate to these convictions.
 

 DISCUSSION
 

 Whether the district court erred in refusing to give Davis’s proposed jury instructions on coercion as a lesser related or lesser included offense of kidnapping
 

 Davis challenges the district court’s refusal to give certain proposed jury instructions setting forth the law of lesser included offenses, lesser related offenses, and the elements of coercion. NRS 207.190 defines coercion, in pertinent part, as follows:
 

 1. It is unlawful for any person, with intent to compel another to do or abstain from doing an act which such other person has a right to do or abstain from doing, to:
 

 (a) Use violence or inflict injury upon such other person or any of his family, or upon his property, or threaten such violence or injury;
 

 (c) Attempt to intimidate such person by threats or force.
 

 2. Any person who violates the provisions of subsection 1 shall be punished:
 

 (a) Where physical force or the immediate threat of such force is used, by imprisonment in the state prison for not less than 1 year nor more than 6 years, and may be further punished by a fine of not more than $5,000.
 

 (b) Where no physical force or immediate threat of such force is used, for a misdemeanor.
 

 Davis argues that coercion is necessarily a lesser included or lesser related offense of kidnapping and that his theory of the case was that coercion, rather than kidnapping, was the crime committed in the Dombrowski incident. Moreover, Davis insists that coercion must be either a lesser included or lesser related offense because in order to commit a kidnapping, a defendant must compel a victim to do an action they have a right to refuse to do, as occurred herein.
 

 Coercion as a lesser related offense
 

 In order to be entitled to a jury instruction on a lesser related offense, three conditions must be satisfied: (1) the lesser offense must be closely related to the offense charged; (2) the defendant’s theory of defense must be consistent with a conviction for the related offense; and (3) evidence of the lesser offense must exist.
 
 *1113
 
 Moore v. State, 105 Nev. 378, 383, 776 P.2d 1235, 1239 (1989). The first element of these requirements has been held to exist where, for example, the defendant is charged with pandering and seeks an instruction on solicitation for prostitution (Stanifer v. State, 109 Nev. 304, 308, 849 P.2d 282, 285 (1993)); or, in the
 
 Moore
 
 case, where there was evidence to suggest that the defendant had acted as an accessory after the fact, rather than in conformity with the charged offense of murder.
 

 Unlike these examples, however, we conclude that “coercion” is not closely related to the crime of kidnapping, at least not any more than it is related to a host of other crimes. We noted in
 
 Moore
 
 that “a defendant has no general right to have the jury presented with a shopping list of alternatives to the crimes charged by the prosecution.”
 
 Moore,
 
 105 Nev. at 383, 776 P.2d at 1238-39. In this regard, the problem with the offense of coercion is that it has potential application as a lesser related offense to virtually every other crime involving force or the threatened use of force. Thus, to adopt Davis’s reasoning on this point would mean that a coercion instruction would have to be given, whenever requested, not only in the case of kidnapping, but also in the case of robbery, rape, false imprisonment, child pornography, child sexual abuse, etc. Frequently, such an instruction would needlessly confuse jurors in otherwise straightforward cases.
 

 More importantly, we conclude that the second required element for such an instruction has not been met. The defendant’s theory of the case, as adduced by the evidence presented, was simply that the crime was committed with a toy gun rather than a real gun. Although Davis argues on appeal that this was not his actual “theory of the case,” it is certainly the only mitigating theory presented by his evidence. Davis’s own trial statements essentially confirmed Dombrowski’s testimony in all other particulars. Merely seeking an instruction on an assertedly lesser related offense, or arguing for such an instruction, does not without more create a “theory of defense” for purposes of the
 
 Moore
 
 three-prong test.
 
 See, e.g.,
 
 Margetts v. State, 107 Nev. 616, 619, 818 P.2d 392, 394 (1991) (a defendant has the right to have the jury instructed on defendant’s theory of the case as disclosed by the evidence).
 

 Even if the allegation of the toy gun were true, it would not negate the charge of kidnapping or provide a reasonable basis for convicting under a theory of coercion. NRS 200.310 defines kidnapping, in relevant part, as follows:
 

 
 *1114
 
 1. Every person who willfully seizes, confines, inveigles, entices, decoys, abducts, conceals, kidnaps or carries away any person
 
 by any means whatsoever
 
 with the intent to hold or detain, or who holds or detains, the person ... for the purpose of committing . . . robbery upon or from the person ... is guilty of kidnaping in the first degree.
 

 (Emphasis added.) Under this statute, even if it were shown that the gun used was actually a toy, this would not establish justification for a coercion instruction since the seizing, abducting or carrying away of the victim for purposes of first-degree kidnapping may be accomplished “by any means whatsoever[,] ” including the use of a weapon which the victim falsely believed to be real.
 

 Although this court has concluded that where kidnapping is incidental to another crime, the evidence of kidnapping must include an element of asportation, physical restraint, or restraint which either increases the risk of harm to the victim or has an independent purpose and significance, one or more of these additional requirements have been met here. Davis’s actions involved asportation (to the bank and back); physical restraint; a restraint and asportation of the victim away from her home to an area fraught with greater prospects for unexpected, precipitous events, thus increasing the risk of harm;
 
 [1]
 
 and the kidnapping had an independent purpose and significance, as it was essential to the accomplishment of the robbery. In Hutchins v. State, 110 Nev. 103, 108, 867 P.2d 1136, 1139-40 (1994), we held:
 

 “While the plain language of NRS 200.310(1) does not require asportation, the court has required it when the kidnapping is incidental to another offense, such as robbery, where restraint of the victim is inherent with the primary offense.” Clem v. State, 104 Nev. 351, 354, 760 P.2d 103, 105 (1988),
 
 overruled on other grounds,
 
 Zgombic v. State, 106 Nev. 571, 798 P.2d 548 (1990). However, if the victim is physically restrained, “this, in itself, establishes kidnapping as an additional offense.”
 
 Clem,
 
 104 Nev. at 354, 760 P.2d at 105. Moreover, the kidnapping is not incidental to the underlying offense if “the restraint increased the risk of harm” or “had an independent purpose and significance as [being] essential to the accomplishment of” the other offense.
 
 Id.
 

 
 *1115
 

 Coercion as a lesser included offense
 

 We have previously held that a jury instruction on a lesser included offense is “mandatory” where “there is evidence which would absolve the defendant from guilt of the greater offense or degree but would support a finding of guilt of the lesser offense or degree.” Lisby v. State, 82 Nev. 183, 187, 414 P.2d 592, 595 (1966). However, we also concluded that:
 

 where the elements of the greater offense include all of the elements of the lesser offense because it is the very nature of the greater offense that it could not have been committed without the defendant having the intent and doing the acts which constitute the lesser offense . . . [and where] the prosecution has met its burden of proof on the greater offense and there is no evidence at the trial
 
 tending to reduce the greater offense,
 
 an instruction on a lesser included offense may properly be refused.
 

 Id.
 
 at 188, 414 P.2d at 595 (emphasis added).
 

 Following this rationale, in Holland v. State, 82 Nev. 191, 414 P.2d 590 (1966), we declined to reverse for failure to give an instruction on a lesser included offense as “the evidence clearly showed guilt above the lesser offense.”
 
 Id.
 
 at 194, 414 P.2d at 592.
 

 We conclude that the same rationale applies here and reject Davis’s claim that the court’s failure to instruct the jury on coercion was error. As noted above, there was clearly sufficient evidence, including Davis’s own corroboration of the victim’s testimony, to satisfy all of the elements of kidnapping. Thus, a lesser included offense instruction on the theory of coercion was properly denied.
 

 Davis emphasizes this court’s many opinions holding that “if there is any evidence at all, however slight, on any reasonable theory of the case under which the defendant might be convicted of a lower degree or lesser included offense, the court must, if requested, instruct on the lower degree or lesser included offense.”
 
 Lisby,
 
 82 Nev. at 188, 414 P.2d at 595. However, Davis fails to cite to any evidence presented at trial tending to reduce the offense or which would support a conviction for a lesser included or lower degree offense. As noted above, even if it were established that the gun used was not real, this fact would not lessen the charge or negate the kidnapping conviction.
 

 We conclude that under the circumstances of the instant case, the giving of jury instructions on lesser related offenses, lesser included offenses, and the offense of coercion, would have served
 
 *1116
 
 only to confuse the jurors in a case which clearly supported a finding of kidnapping.
 

 Whether there was sufficient evidence to prove beyond a reasonable doubt that Davis used a deadly weapon during the Dom-browski incident
 

 Davis contests his deadly weapon sentence enhancements for robbery and kidnapping on grounds that the State failed to prove beyond a reasonable doubt that he had used a gun in connection with the Dombrowski crimes.
 

 The standard of review in a criminal case is “whether, after viewing the evidence in the light most favorable to the prosecution,
 
 any
 
 rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” [Citations omitted.] The established rule is that it is the jury’s function, not that of the court, to assess the weight of the evidence and determine the credibility of witnesses. Walker v. State, 91 Nev. 724, 726, 542 P.2d 438, 438-39 (1975).
 

 McNair v. State, 108 Nev. 53, 56, 825 P.2d 571, 573 (1992). Viewing Dombrowski’s testimony (that a man with a cold and heavy metallic-looking gun thrust into her side had kidnapped and robbed her) in the light most favorable to the prosecution, a rational trier of fact could have found beyond a reasonable doubt that Davis used a deadly weapon in the commission of this crime.
 

 Davis’s bare-boned assertion that the gun in question was a toy was obviously rejected by the jury. It is not this court’s function to reweigh conflicting testimony or to pass on Davis’s credibility. Interestingly, according to Detective Karstedt, Davis initially described the gun as not a real gun but a BB gun; whereas by the time of trial, Davis had changed his story to indicate that the gun was even less than a BB gun and was simply a toy gun which shot rubber BB-like bullets. We will not speculate as to whether, between his initial interrogation and his trial testimony, Davis had been informed that a BB gun of sufficient caliber can constitute a “firearm” for purposes of the enhancement statute. Manning v. State, 107 Nev. 337, 810 P.2d 1216 (1991). Rather, simply viewing the evidence in the light most favorable to the prosecution, we conclude that there was sufficient evidence to support the jury’s finding that Davis used a deadly weapon in the course of victimizing Dombrowski.
 

 Davis’s reliance on Bias v. State, 105 Nev. 869, 784 P.2d 963 (1989), to support his contentions on this issue is misplaced.
 
 Bias
 
 involved a toy gun which was retrieved from the scene of the
 
 *1117
 
 crime and was shown to be incapable of use as a deadly weapon.
 
 Bias
 
 did not involve, as in the instant case, the question of whether the gun was real or a toy. Simply stated,
 
 Bias
 
 is inappo-site.
 

 Dombrowski complied with Davis’s demands and handed him $500.00 because of her belief that her life was threatened by a deadly weapon directed at her by Davis. He should not now be heard to complain if the jury was equally convinced concerning the nature of the weapon. Davis was fairly tried and convicted of the charges pertaining to the Dombrowski offenses.
 

 Whether the court erred in declining to declare a mistrial because victims Michael R. Sanchez and his wife were advised against discussing the case with others
 

 Davis complains that he was deprived of a fair trial because the two Sanchez victims were instructed that they should not discuss the case with anyone. He refers us to the following trial colloquy in support of his contention:
 

 Q. Mr. Sanchez, did you speak to anybody before you came to court today regarding this case?
 

 A. Some gentleman approached me with a book. Asked— he says could you identify this at trial and we said, no, we couldn’t talk to anybody.
 

 Q. Mr. Sanchez, has anyone ever instructed you not to speak to anyone about this case?
 

 A. Yes.
 

 Q. Who was it that instructed you to do that?
 

 A. When I went for the lineup, the officer said that you can’t say anything about this. I can’t tell you anything. Just look at these pictures and tell the truth.
 

 Q. Okay. Mr. Sanchez, my question is did anyone either from the District Attorney’s Office or from the police department tell you that you could not either speak to Damon’s attorney or investigator regarding this case?
 

 A. They said I shouldn’t speak to anybody.
 

 Q. Mr. Sanchez, did a man with a badge identifying himself as someone from my office approach you outside and ask you to look at pictures?
 
 [2]
 

 
 *1118
 
 A. Yes.
 

 Q. And what did you tell him, Mr. Sanchez?
 

 A. We weren’t to discuss the case with anybody.
 

 The Court. Okay, Okay. Let me ask you this. Did anybody tell you not to speak to the public defender, the defendant in the case, or investigators from the Public Defender’s Office. The Witness. He says I can’t stop you from talking to anybody, but I suggest you shouldn’t — you can talk to anybody you want to. I can’t tell you who you can talk to or you can’t, but you shouldn’t talk to anybody.
 

 The Court. . . . who said this to you?
 

 The Witness. The attorney.
 

 Ms. Salvucci. It was an attorney and not a police officer? The Witness. Right.
 

 Mr. Sanchez also testified as follows:
 

 Q. ... Now, you testified that someone told you not to talk to anyone?
 

 Q. ... Do you remember who that person was?
 

 A. The officer, when I went to look at the photographs, he says, “You shouldn’t discuss the trial with anybody.”
 

 Q. Okay.
 

 A. “I can’t tell you you can or can’t,” because someone called us and asked us questions and we said, “What do we do?” He said, “Well, I can’t tell you what to do. I can just suggest.”
 

 Q. Do you remember was that Detective Karstedt?
 

 A. I don’t recall his name. Detective that talked to me, yes. Q. Was that the detective that administered the photo lineup to you?
 

 A. Yes.
 

 Detective Karstedt testified as follows:
 

 A. Always I told them and as I would tell any victim and what I suggest to them, I don’t tell them what to do. First of all, I would not tell them not to talk to anybody. What I suggest to them, I told them is that not to talk to anyone else. However, if they felt it necessary, they get a hold of the District Attorney’s Office or seek legal advice upon doing so.
 

 Q. Detective Karstedt, my question is did you tell Mr. or Mrs. Sanchez not to discuss this case with anyone or that they should not discuss this case with anyone?
 

 A.. No, I did not.
 

 
 *1119
 
 Davis sought a mistrial based upon a denial of his right to discovery and its prejudicial impact on his right to a fair trial. The motion was denied without explanation, thus making it unclear whether the denial was based on the court’s factual finding or on a rejection of Davis’s legal arguments. In any event, it is clear from Mr. Sanchez’s testimony and the Sanchezes’ actions that someone, either from the District Attorney’s office or the police, discouraged the Sanchezes from speaking about the case, and that the Sanchezes applied this advice against representatives of the defendant. Davis now asserts that the district court’s denial of his motion for a mistrial was in error, and claims that the prejudice to him is illustrated by the Sanchezes’ refusal to look at a picture of another suspect which they may have identified as the true perpetrator.
 

 In support of his position, Davis cites Gregory v. United States, 369 F.2d 185 (D.C. Cir. 1966), where the prosecutor, while not forbidding witnesses to the crime from speaking about the case, advised them not to speak to anyone outside his presence. When witnesses thus declined to speak to defense counsel, the defendant sought the court’s intervention, which was refused. On appeal, the
 
 Gregory
 
 court stated:
 

 Witnesses ... to a crime are the property of neither the prosecution nor the defense. Both sides have an equal right, and should have an equal opportunity, to interview them. Here the defendant was denied that opportunity which, not only [a] statute, but elemental fairness and due process required that he have. . . .
 

 A criminal trial ... is a quest for truth. That quest will more often be successful if both sides have an equal opportunity to interview the persons who have the information from which the truth may be determined. ... It is not suggested here that there was any direct suppression of evidence. But there was unquestionably a suppression of the means by which the defense could obtain evidence. The defense could not know what the eye witnesses to the events in suit were to testify to or how firm they were in their testimony unless defense counsel was provided a fair opportunity for interview. In our judgment the prosecutor’s advice to these eye witnesses frustrated that effort and denied appellant a fair trial.
 

 Id.
 
 at 188-89.
 

 In State v. York, 632 P.2d 1261, 1264 (Or. 1981), a case cited to the trial court by Davis, the court, on a similar set of facts, held “that a prosecutor should not improperly interfere with the effort by the defense to interview prospective witnesses by
 
 *1120
 
 instructing them not to talk to the defense attorney or by telling them that ‘it would be better if they didn’t say anything.’” Although the
 
 York
 
 court determined that there was no prejudice to the defendant because the involved witnesses stated they would have declined to speak to defense counsel in any case, we are persuaded that the underlying rule of
 
 York
 
 is sound.
 

 As
 
 York
 
 and the Pennsylvania case relied upon therein both note, prosecutors and police are not required to encourage or advise witnesses to speak with defense counsel, and witnesses may not be compelled to do so. Rather, the rule simply recognizes that, given the respect accorded police and prosecutors by victims and witnesses, when such officials suggest that a witness not speak to the defense this may have the same practical effect as directly telling a witness not to do so. Such a course of action violates the policy against non-interference with a defendant’s access to witnesses and with a defendant’s legitimate efforts to prepare a defense.
 

 We conclude that this rule applies in Nevada. Absent special circumstances, prosecutors and police officers are not to suggest to witnesses and victims that they refrain from speaking to others about the case in a manner which would include the defense or tend to discourage witnesses from cooperating with defense counsel and defense investigators.
 
 [3]
 
 We note, however, that this principle of access to witnesses applies only to defense counsel and their investigators. Suggestions by police officers or prosecutors that witnesses refrain from speaking to others, with the exception of representatives of the defense, do not violate any public policy.
 
 [4]
 

 Because of the violation of the rule announced above, we are forced to conclude that Davis’s convictions arising out of the Sanchez incident must be vacated and dismissed with prejudice, as the harm resulting from the violation is not susceptible to repair upon retrial. First, the Sanchezes may continue to decline to speak with defense counsel or defense investigators based upon the earlier advice they received. Second, and more importantly, even if the victims were willing to view pictures of other sus
 
 *1121
 
 pects, there would be a natural tendency not to deviate from previous trial testimony even if a review of the pictures caused some doubt concerning their earlier identification of Davis. The prospects for “unringing the bell,” if indeed the sounds of the first bell were untrue, are sufficiently slight as to constitute a denial of due process if we were to remand for a new trial.
 

 CONCLUSION
 

 For the reasons stated above, we reverse and vacate all of Davis’s convictions relating to the Sanchez crimes with instructions that the district court dismiss the underlying charges with prejudice. All of Davis’s remaining convictions, and the judgments entered pursuant thereto, are affirmed.
 
 [5]
 

 [1]
 

 Dombrowski described the area in which the bank was located as “a dark little shopping center” where she feared she was in danger of being “rape[d] and killfed] ... in the back of the parking lot.”
 

 [2]
 

 The purpose of this request was assertedly to determine whether the Sanchezes would identify another suspect, rather than Davis, as having been the perpetrator of the crime. The defense theory was that two of Davis’s friends, one of whom was in the standby car during the Dombrowski incident, were the actual perpetrators.
 

 [3]
 

 We note that there was no apparent need in the present case to conceal witness identities for fear that witnesses might be intimidated or otherwise made unavailable for trial; nor did it implicate the protections to be afforded the needs of sensitive witnesses, such as child victims. We do not here address the issue of what is proper prosecutorial conduct in such other cases involving a showing of exceptional circumstances.
 

 [4]
 

 There may be occasions where such advice would even be required under the provisions of SCR 179(5).
 

 [5]
 

 The Honorable Mirian Shearing, Justice, did not participate in the decision of this appeal.