KEVIN JAMES LISLE AND JERRY LOPEZ, APPELLANTS, v. THE STATE OF NEVADA, RESPONDENT.

No. 28773

June 17, 1997                    941 P.2d 459

680

[Rehearing denied January 23, 1998]

*Morgan D. Harris,* Public Defender; *Michael L. Miller,* Deputy, and *Ralph Baker,* Deputy, Clark County, for Appellant Lisle.

*David M. Schieck,* Las Vegas, for Appellant Lopez.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Stewart L. Bell,* District Attorney, *James Tufteland,* Chief Deputy, and *Daniel M. Seaton,* Deputy, Clark County, for Respondent.

## OPINION

*Per Curiam:*

On August 22, 1994, between 4:00 to 4:30 a.m., the body of nineteen-year-old Justin Lusch ("Justin") was found shot to death in the Lone Mountain desert area in Las Vegas. Appellants Kevin James Lisle ("Lisle") and Jerry Lopez ("Lopez") were each convicted of first degree murder with use of a deadly weapon and conspiracy to commit murder. In addition, Lisle was convicted of being an ex-felon in possession of a firearm. Lisle was sentenced to death, and Lopez was sentenced to life in prison with the possibility of parole. On appeal, Lisle and Lopez each argue a multitude of issues. We conclude that none of these contentions have merit and, accordingly, affirm the convictions and Lisle's sentence of death.

### FACTS

In early July 1994, Justin began living with a friend, Eric Resma ("Resma") in Resma's converted garage, which was a known "drug house." About August 8, 1994, two weeks prior to Justin's death, Lisle and Lopez visited Resma's garage for the first time, looking for their friend, Jason Sullivan ("Sullivan"), who had recently lived there, but had since moved out. Resma talked with Lisle and Lopez and invited them inside to ingest drugs. From that day forward, Lisle and Lopez continued to frequent Resma's residence. At some point thereafter, Resma found a .380 caliber automatic gun between his couch cushions. When Resma asked the occupants of the garage where it came from, either Lisle or Lopez took the gun from Resma and put it in his own pants waistband.

On August 17, 1994, Lisle and Sullivan participated in a drug transaction at Resma's house. Lisle sold Sullivan ten grams of

methamphetamine with the understanding that Sullivan would pay Lisle for the narcotics within a few days. Sullivan then sold Justin 1.75 grams for which Justin would pay later. Sullivan took his portion of the drugs, along with five or six rifles he also presumably received from Lisle, to the house of his girlfriend, Nicole Catherina ("Catherina"), where Sullivan was then living. Later that day, Sullivan was arrested on unrelated charges.

The next day, on August 18, 1994, Catherina contacted Resma so that she could return the drugs and guns to Lisle. Resma and Justin went to Catherina's residence to pick up the items and took them to Resma's house where Lisle and Lopez were waiting. Resma gave the drugs to Lisle, but put the rifles, wrapped in a blanket, on the couch. Justin told Lisle that Sullivan had given him a portion of the drugs, and Lisle demanded to know their location. Justin replied that the drugs were locked away and he did not have them in his possession at the moment. Lisle continued to demand to see the drugs. He appeared very upset and seemed to disbelieve Justin. Resma then stated that he had the drugs and asked Lisle if he wanted to see them. Lisle calmed down once Resma interjected; Lisle stated that he did not need to see the drugs.

Throughout this conversation, Lisle was "fiddling" with his .380 caliber weapon. He was cleaning it, and the clip containing ammunition was not in the gun. Nevertheless, Justin asked Lisle if he was threatening him with the gun. Lisle said he was not; if he had a problem with Justin, he would take him outside and they would box.

Later that day, Justin separately told his friends, Ryan Cizl ("Cizl") and Jeff Kurtz ("Kurtz"), that Lisle had held a gun to his head. He also told them that later Lisle apologized to Justin. Both Kurtz and Cizl testified at trial that although Justin was prone to exaggerate, this time they did not detect any hyperbole from him.

Sometime between August 18, 1994, and August 21, 1994, Justin found the rifles that were returned at Resma's residence.[1] He thought they were stolen and stated that he wanted the guns removed from the residence or else he would turn them over to his father, the chief of police for North Las Vegas. Thereafter, another resident at Resma's garage, T. J. Willis ("Willis"), told Lisle what Justin had said about the guns. Lisle apparently stated to Willis that he advised Justin not to do that.

---

[1]It is unclear from the record how Justin "found" these rifles when he participated in obtaining them from Catherina to return to Lisle. Presumably, since the rifles were wrapped in a blanket, Justin did not know what they were.

On August 21, 1994, in the late evening hours, Lisle, Lopez, and some other friends, including Adam Evans ("Evans"), were at the house of Anthony Vanella ("Vanella"). Lisle stated, in Evans' presence, that he was going to kill a "snitch" named Justin. Lopez was not present at this conversation.

In the meantime, at approximately 10:30 p.m., Kurtz telephoned Justin to request that Justin procure some drugs for him. Between 11 p.m. to midnight, Justin gave another friend a ride home from Resma's garage. While Justin was out, Kurtz called back again and left a message. When Justin returned home, he did not call Kurtz back right away.

At approximately 2 a.m. on August 22, 1994, Lisle and Lopez left Vanella's house. Either Lopez or Lisle had a .380 caliber gun tucked into his waistband.

At approximately 2:30 a.m., Justin returned Kurtz's phone call to inform him that he was going out to get the drugs. Justin stated that he was on his way out the door at that moment and he would contact Kurtz in fifteen minutes. He stated he was getting the drugs from some people known as "Vatos" and that they were at the door right now. Lisle and Lopez were known as "Vatos," and Justin, in particular, enjoyed calling them by that nickname. Kurtz, who was anxiously awaiting his delivery, called Justin again at 3 a.m. and received no answer.

Between approximately 4:00 to 4:30 a.m., Justin's body was found at an area in the desert known as Lone Mountain. It was later determined that this was an area that Lisle and Lopez were known to frequent for shooting practice. Justin was shot three times: once in the upper chest, once in the right side of his back, and once in his lower back.

Meanwhile, between 4:00 to 4:30 a.m., Lisle and Lopez returned to Vanella's house. Lisle had the gun in his possession. Evans testified that Lisle told Vanella, "I smoked him. I got him. I killed a snitch. We took him to where we used to shoot and he ran and I shot him in the back." In addition, Vanella's mother overheard Lisle say, "I took him to the desert and I did him. I shot him four times and I think I hit him three. He was a rat. I knew he was a rat and I'm glad I did it." Lisle also mentioned the "snitch's" name was Justin. Lopez then stated, "We did it clean and we did it good. Nobody is going to find out that we did it. You don't have to worry."

Vanella then suggested to Lisle and Lopez to get rid of the gun, whereupon Lisle stated that he would go out and sell it. Lisle and Lopez then left Vanella's house and returned about one hour later. Lisle stated he sold the gun for $50.00.

Later on August 22, 1994, between 9 or 10 p.m., Vanella brought Lisle and Lopez to the house of Larry Prince ("Prince")

for the first time.[2] Lisle, Vanella, and Prince discussed a drug transaction. At the conclusion of this conversation, Lisle asked Vanella to leave the room. When Prince and Lisle were alone, Lisle stated, "There's something I have to let you know. I killed a snake. I mean I offed a snitch, I offed someone. I offed a human being. I killed someone." He then stated the victim was a son of a police officer, but did not name him. Lisle did, however, state that it would be on the news that evening. At 11 p.m., they all watched the news. Upon seeing a story of a body found in the desert, Lisle seemed to display a sense of satisfaction, while Lopez portrayed no reaction at all.

The next day, August 23, 1994, Prince assisted Lisle and Lopez in disposing of a trash bag that purportedly contained two pairs of tennis shoes. Evans testified that within a couple days after the murder, he noticed that Lisle and Lopez wore different tennis shoes than they had worn prior to Justin's death.

Sometime between August 22, 1994, and August 25, 1994, Lisle showed Prince a .380 caliber automatic gun, but explained that this was not the weapon used to kill Justin. Lisle stated, "Don't worry about that one. That one's long gone."

On August 25, 1994, the police arrested Prince at his home for possession of a controlled substance with intent to sell. While there, the police observed Lisle sitting in a certain armchair. Later that day, upon searching Prince's house pursuant to a search warrant, the police found a .380 caliber gun tucked into the seat cushions of the very chair on which Lisle had been sitting. Although this gun was later determined not to be the same weapon that killed Justin, it was discovered that the brand of bullets found in the gun was the same brand used to shoot Justin.

In late August 1994, Lisle informed his friend, John Melcher ("Melcher"), that he was "laying low" because the police were trying to "get" him for the murder of the North Las Vegas police chief's son, but that the police did not have enough evidence on him.

Lisle introduced Melcher to Lopez. Lopez told Melcher that he and Lisle picked up Justin and took him to the desert. Lopez stopped the car, and Lisle and Justin got out and went to the back of the car, whereupon Lopez observed Lisle shoot Justin. Lopez was able to witness this incident by looking at the rear-view mirror.

On October 22, 1994, Lisle, Melcher, and Evans were involved in the murder of Kip Logan ("Logan"). Lisle was eventually convicted of first degree murder and sentenced to

---

[2]Prince was a man in his late forties who provided food, drugs, money, and a place to stay for teenagers and young adults in the neighborhood.

death.[3] Melcher and Evans eventually agreed to a plea bargain for their participation in Logan's death in exchange for testifying against Lisle for the killing of both Logan and Justin. In addition, Prince plea bargained the August 25, 1994 drug charges pending against him in exchange for testifying at both murder trials.

In early 1995, while Melcher and Lisle were incarcerated together because of the Logan murder, Lisle told Melcher that he looked Justin in the eyes before he killed him and that he got a thrill from it.

In July 1995, Lisle and Lopez were arrested for Justin's murder, and on July 28, 1995, an information was filed charging Lisle and Lopez each with murder with use of a deadly weapon and conspiracy to commit murder. In addition, Lisle was charged with being an ex-felon in possession of a firearm.

Trial began on April 9, 1996, and concluded on April 18, 1996, resulting in verdicts of first degree murder with use of a deadly weapon and conspiracy to commit murder for both Lisle and Lopez. Lisle was also found guilty of being an ex-felon in possession of a firearm. The penalty hearing began April 22, 1996, and concluded on April 25, 1996, resulting in a sentence of death for Lisle and a sentence of life in prison with the possibility of parole for Lopez.

On June 4, 1996, both appellants were formally sentenced. On June 6 and 7, 1996, Lopez and Lisle respectively filed their notices of appeal.

## DISCUSSION

### LOPEZ

*The district court did not err in denying Lopez's motion to sever trials from Lisle*

On December 20, 1995, Lopez filed a motion to sever the defendants' trials. The district court denied the motion on March 21, 1995. Lopez contends that the district court erred.

Initially, we note that joinder of defendants is within the discretion of the trial court and its decision will not be reversed absent an abuse of discretion. Jones v. State, 111 Nev. 848, 853, 899 P.2d 544, 547 (1995); NRS 174.165(1). While making this decision, a court "must consider not only the possible prejudice

---

[3]Lisle was apparently sitting in the passenger's seat of a van while Melcher was driving it on the freeway. Evans was sitting in the back seat behind Lisle. Lisle was making gang hand signals and yelling at the cars that passed them on the right side. Logan was a driver of a car next to them, who started to laugh at Lisle. Lisle pulled out a gun and shot Logan, killing him.

to the defendant but also the possible prejudice to the Government resulting from two time-consuming, expensive and duplicitous trials." United States v. Andreadis, 238 F. Supp. 800, 802 (E.D.N.Y. 1965).

Any possible prejudice may be cured by providing an adequate jury instruction to prevent the jury from associating evidence admissible for one defendant with the other defendant. *Id.* Therefore, the ultimate issue is "whether the jury can reasonably be expected to compartmentalize the evidence as it relates to separate defendants." *Jones*, 111 Nev. at 854, 899 P.2d at 547. The jury is expected to follow the instructions in limiting evidence for each defendant. Spencer v. Texas, 385 U.S. 554, 562 (1967).

In the present case, when any evidence was presented against Lisle, which was not admissible against Lopez, the judge instructed the jury as such.[4]

Even with these principles in mind, a defendant is entitled to a separate trial if he presents a sufficient showing of facts demonstrating that substantial prejudice would result in a joint trial. Amen v. State, 106 Nev. 749, 755, 801 P.2d 1354, 1358 (1990).

In the present case, Lopez alleges that he was sufficiently prejudiced because the evidence presented against Lisle was so overwhelming that a "spillover" effect occurred. "The 'spillover' or 'rub-off' theory involves the question of whether a jury's unfavorable impression of [one] defendant against whom the evidence is properly admitted will influence the way the jurors view the other defendant." State v. Rendon, 715 P.2d 777, 782 (Ariz. App. 1986). Lopez alleges that because Lisle was adorned with various visible tattoos, was involved in a drug transaction, and the evidence against Lisle in this trial was so substantial, Lopez was found guilty based on his association with Lisle.

Severance of defendants will not be granted if based on "guilt by association" alone. United States v. Boffa, 513 F. Supp. 444, 487 (D. Del. 1980). Merely having a better chance at acquittal if the defendants are tried at separate trials is not sufficient to

---

[4]In addition, the court provided jury instruction 22:

The information names two (2) defendants who are on trial together. In reaching a verdict, however, you must bear in mind that guilt is individual. Your verdict as to each defendant must be determined separately, without regard to the guilt or innocence of anyone else.

In addition, some of the evidence in this case was limited to one defendant. Any evidence admitted solely against one defendant may be considered only as against that defendant and may not, in any respect, enter into your deliberations on any other defendant.

establish prejudice. United States v. Baker, 10 F.3d 1374, 1388 (9th Cir. 1993), *cert. denied,* 513 U.S. 934 (1994). In addition, a defendant is not entitled to a severance merely because the evidence admissible against a co-defendant is more damaging than that admissible against the moving party. *Id.*

We conclude that Lopez's argument amounts to nothing more than that he would have had a better chance at acquittal if he and Lisle had separate trials. In addition, the district court gave adequate instructions to the jury not to consider the evidence against Lisle when deciding the verdict for Lopez. Accordingly, we find that the district court did not abuse its discretion by denying Lopez's motion to sever.

*Lopez may not challenge the district court's denial of Lisle's motion for mistrial*

During the trial, Lisle moved for a mistrial which was denied.[5] Lopez did not join in this mistrial nor raise any objections at trial regarding the circumstances leading to this motion. Nevertheless, Lopez argues that he was prejudiced simply because he was associated with Lisle.

We need not address this issue because Lopez did not raise this issue at trial. McCullough v. State, 99 Nev. 72, 74, 657 P.2d 1157, 1158 (1983).

*The district court did not err by admitting the hearsay statements Justin made to Kurtz*

Kurtz testified that on August 22, 1994, at 2:30 a.m., he spoke with Justin on the phone. Justin said he was going out the door to get Kurtz some drugs and that he was going out with a couple of people Justin referred to as "Vatos" to get drugs.[6] Justin further told Kurtz that "Vatos" were there right now. Justin assured Kurtz that he would be back in fifteen minutes after completing the deal. Over objection, the district court admitted this hearsay testimony based on the present sense impression exception and the state of mind exception. Lopez contends that this was error. Initially, we note that the statements are highly relevant to prove Justin was with Lisle and Lopez at the time he was murdered.

### Present sense impression exception

NRS 51.085 states: "A statement describing or explaining an event or condition made while the declarant was perceiving the

---

[5]The circumstances of this motion for mistrial and its merits will be discussed below.

[6]Lisle and Lopez were "Vatos."

event or condition, or immediately thereafter, is not inadmissible under the hearsay rule.''

Lopez alleges that ''[n]o evidence existed [to] show that [Justin] was describing events as they happened or as he had observed them happening.'' We conclude that Lopez's argument is untenable because Kurtz testified that Justin stated that ''Vatos'' were present at the exact moment that Justin was telling Kurtz that they were present. This is precisely what the present sense impression exception in NRS 51.085 encompasses.

### State of mind exception

NRS 51.105(1) states: ''A statement of the declarant's then existing state of mind, emotion, sensation or physical condition, such as *intent* . . . is not inadmissible under the hearsay rule.'' (Emphasis added.)

The *Hillmon*[7] doctrine is a well-settled rule of evidence which provides that

> when the performance of a particular act by an individual is an issue in a case, his intention (state of mind) to perform that act may be shown. From that intention, the trier of fact may draw the inference that the person carried out his intention and performed the act. Within this conceptual framework, hearsay evidence of statements by the person which tend to show his intention is deemed admissible under the state of mind exception.

United States v. Pheaster, 544 F.2d 353, 376 (9th Cir. 1976), *cert. denied*, 429 U.S. 1099 (1977).

In the instant matter, Justin told Kurtz his intent to go out with ''Vatos.'' Pursuant to *Hillmon* and NRS 51.105(1), the district court did not err by allowing Justin's statement of intent to be admissible as direct evidence that he did, indeed, carry out that intent and go out with ''Vatos.''

### Sufficient evidence exists to support Lopez's conviction for first degree murder

''[T]he test for sufficiency [of the evidence] upon appellate review is not whether this court is convinced of the defendant's guilt beyond a reasonable doubt, but whether the jury, acting reasonably, could be convinced to that certitude by evidence it had a right to accept.'' Edwards v. State, 90 Nev. 255, 258-59, 524 P.2d 328, 331 (1974). Additionally, this court has held that

---

[7]Mutual Life Ins. Co. v. Hillmon, 145 U.S. 285 (1892).

circumstantial evidence alone may sustain a conviction. *Deveroux v. State*, 96 Nev. 388, 391, 610 P.2d 722, 724 (1980).

Evidence admissible against Lopez regarding the first degree murder charge includes: (1) Lopez's statement in the presence of Evans, "*We* did it clean and *we* did it good. Nobody is going to find out that *we* did it." (Emphasis added); (2) Lopez's statement to Melcher that he and Lisle picked up Justin and took him to the desert and that Lopez observed Lisle shoot Justin; (3) Justin's statement to Kurtz that he was going out with "Vatos," also known as Lisle and Lopez, shortly before he was killed; (4) Lopez left Vanella's house with Lisle at 2 a.m. on August 22, 1994, and returned with Lisle at about 4 a.m., which was the two-hour period within which Justin was killed; (5) Lopez accompanied Lisle to sell the gun; (6) Justin's body was found in a desert area that Lopez was known to frequent; and (7) Lopez wore different tennis shoes after Justin was killed than he did before Justin's death, and Prince assisted Lopez in disposing of tennis shoes the day after the murder.

Accordingly, we conclude that the evidence is sufficient for "*any* rational trier of fact [to find] the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

## LISLE

*The district court did not err in denying Lisle's motion to sever trials from Lopez*

On December 29, 1995, Lisle filed a motion to sever his trial from that of Lopez. He based this motion on the statement that Lopez made to Melcher, incriminating Lisle; specifically, Lopez told Melcher that he observed Lisle shoot Justin at the rear of the car. On March 21, 1996, the district court filed its order denying Lisle's motion. However, the court ordered that when Melcher testified as to Lopez's statement, the statement must be redacted so as to exclude any reference to Lisle. Accordingly, when Melcher testified, he stated that Lopez observed "the other guy" shoot Justin.

Lisle cites *Bruton v. United States*, 391 U.S. 123 (1968), for the proposition that Lisle's constitutional right to cross-examine the witness was violated when Lopez's hearsay statements, which inculpate Lisle, were admitted. However, Lisle fails to cite *Richardson v. March*, 481 U.S. 200 (1987). *Richardson* held that if a statement is redacted to exclude defendant's existence and the statement is not incriminating on its face, but only when linked

with other evidence introduced later at trial, then a limiting instruction will cure any prejudice. *Id.* at 211. Therefore, a redacted version of the statement may be admitted. *Id.*

The United States Court of Appeals for the Ninth Circuit extended this concept to allow defendant's name to be replaced by a neutral word, such as "individual." Therefore, although the statement referred to defendant's existence, the court allowed it to be admitted as long as his name was not used. United States v. Enrique-Estrada, 999 F.2d 1355, 1359 (9th Cir. 1993).

Here, Melcher's testimony that Lopez observed "the other guy" shoot Justin is not incriminating on its face because it does not, in and of itself, reference Lisle. Only when other evidence introduced at trial linked that statement to Lisle did it incriminate him. Under *Richardson* and *Enrique-Estrada,* this is not a violation of Lisle's constitutional rights.

Lisle also cites Stevens v. State, 97 Nev. 443, 444, 634 P.2d 662, 663 (1981), which reversed a co-defendant's conviction because "[i]t appears likely that the jury read the appellant's name into the blanks" in her co-defendant's statement. This case is distinguishable because no direct evidence, only circumstantial evidence, was introduced of Stevens' involvement in the crime; therefore, her co-defendant's statement, although redacted, was extremely damaging. In the instant matter, regardless of Lopez's statement, four other witnesses heard Lisle confess to killing Justin.[8] *See id.* at 445, 634 P.2d at 664 (holding harmless error analysis applies).

Accordingly, we conclude that the district court did not abuse its discretion in denying Lisle's motion to sever.

*The district court did not err by denying Lisle's motion to sever his ex-felon in possession of a firearm count from the murder and conspiracy counts*

On December 29, 1995, Lisle filed his motion to sever his ex-felon in possession of a firearm count from the murder and conspiracy counts. Lisle alleged that submitting evidence of his prior felony, conspiracy to sell a controlled substance, as an element of the firearm charge would unduly prejudice the jury against him with respect to the murder and conspiracy charges. On March 21, 1996, the district court denied this motion. Lisle asserts that the district court erred because joinder of the counts was prejudicial.

We have held that joinder decisions are within the district court's discretion and that this court will not reverse that decision absent an abuse of discretion. Robins v. State, 106 Nev. 611,

---

[8]These witnesses are Evans, Prince, Vanella's mother, and Melcher.

619, 798 F.2d 558, 563 (1990), *cert. denied,* 499 U.S. 970 (1991). The Ninth Circuit held that "the test is whether joinder was so prejudicial that the trial judge was compelled to exercise his discretion to sever." United States v. Lewis, 787 F.2d 1318, 1321 (9th Cir. 1986), *amended by* 798 F.2d 1250 (1986). In addition, the defendant has the burden to prove that the prejudice was "of such magnitude that the defendant's right to a fair trial was abridged." *Id.*

In United States v. Jiminez, 983 F.2d 1020, 1022 (11th Cir. 1993), *cert. denied,* 510 U.S. 925 (1993), a charge of being an ex-felon in possession of a firearm was joined with a count charging conspiracy to distribute a controlled substance. Defendant alleged that he was unduly prejudiced by admission of his prior felony because that previous conviction was unrelated to the conspiracy charge. The court held that the lower court did not abuse its discretion by denying defendant's motion to sever counts because the prior felony conviction was not unduly emphasized. *Id.* at 1023.

In the present case, the prior felony conviction was not emphasized. It was merely read in a jury instruction naming the charges against Lisle.

We conclude, therefore, that manifest prejudice did not result from the information that Lisle had previously been convicted of conspiracy to sell a controlled substance. It is doubtful that the jury convicted Lisle of murdering Justin based solely on the fact that Lisle had previous dealings with narcotics. In addition, admissible evidence was presented that Lisle participated in a drug transaction with Sullivan. Therefore, even if the charges had been severed and the jury remained unaware of Lisle's prior felony conviction, the jury would still have been mindful of Lisle's involvement with drug sales.

Accordingly, the district court did not abuse its discretion in denying Lisle's motion to sever counts.

*The district court did not err in denying Lisle's motion to compel discovery of the prosecutor's written notes from a July 12, 1995 interview with Melcher*

Melcher was involved in the Logan murder for which Lisle was eventually convicted. Prior to the Logan trial, Melcher, through his attorney, arranged a plea bargain with prosecutor Dan Seaton ("Seaton"), who prosecuted both the Logan trial and the present one. Prior to the Logan trial, Melcher, his attorney, and Seaton met on July 12, 1995, to discuss information Melcher had regarding statements Lisle allegedly made to Melcher about both homicides. Seaton took notes of the interchange in anticipation of the upcoming Logan trial, as well as the instant trial.

On July 24, 1995, Melcher gave a statement to the police reiterating the same information he provided Seaton. In addition, on November 1, 1995, Melcher met with Lisle's attorney and gave the same information as to what Lisle previously told Melcher about both murders.

After the October 1995 Logan trial, Lisle's attorney filed a post-trial motion which the State opposed.[9] In that opposition, the State allegedly referred to the fact that Melcher's statements to Seaton regarding what Lisle had previously told Melcher were consistent with what Melcher had told the police, with what Melcher had testified at the present case's preliminary hearing, and with what Melcher had testified at the Logan trial.[10]

On December 29, 1995, with respect to the current case, Lisle filed a motion to compel discovery of Seaton's notes of the July 12, 1995 interview with Melcher. On March 21, 1996, the district court denied the motion. Lisle now appeals, arguing that the notes were not attorney work-product and that even if they were, Seaton waived the work-product protection.

Initially, we note that resolution of discovery issues are normally within the trial court's discretion. People v. District Court of El Paso County, 790 P.2d 332, 336 (Colo. 1990).

"At its core, the work-product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case." United States v. Nobles, 422 U.S. 225, 238 (1975) (extending the work-product privilege to criminal cases).

Lisle argues that these notes are not work-product because they do not contain theories, opinions, or conclusions of the attorney; rather, they contain only factual information. See State v. Nunez, 534 P.2d 270, 271 (Ariz. App. 1975) (holding that the district attorney's notes are not work-product because they did not contain theories, opinions, or conclusions as the state statute defining work-product requires).

---

[9]The record for the current case does not reveal the nature of this motion.

[10]Apparently, the State's opposition did not specifically refer to Seaton's notes; however, Lisle asserts in the current appeal that "the contents of the notes were alleged to support the District Attorney's argument that Mr. Melcher's statements were consistent. By using the notes in the litigation the District Attorney has opened them up for discovery . . . ."

We note that Lisle has not referenced the record on appeal for this allegation nor has he specified how Seaton used the notes in the current litigation. We further note that at trial for Justin's murder, Seaton did not use his notes to bolster Melcher's testimony. Assuming that the State did mention these notes, it was in regard to the Logan case, not this one. Therefore, Lisle's argument is misplaced and without merit.

However, Nevada's relevant statute, NRS 174.245(1), does not limit non-discoverable documents to only "theories, conclusions, or opinions." Rather, NRS 174.245(1) is broader, stating, in part, "[T]his subsection does not authorize the discovery or inspection of reports, memoranda or other internal state documents made by state agents in connection with the investigation or prosecution of the case, *or of statements made by state witnesses or prospective state witnesses,* other than the defendant, to agents of the state." (Emphasis added.)

Accordingly, we conclude that because Seaton took notes during his interview with Melcher, they were prepared in anticipation of litigation and are, therefore, attorney work-product.

However, the work-product privilege is not absolute and may be waived. *Nobles,* 422 U.S. at 239.

> What constitutes a waiver with regard to work-product materials depend, of course, upon the circumstances. Counsel necessarily makes use throughout trial of the notes, documents, and other internal material prepared to adequately present his client's case, and often relies on them in examining witnesses. When so used, there normally is no waiver. But where, as here, counsel attempts to make a *testimonial use* of these materials the normal rules of evidence come into play with respect to cross-examination and production of documents.

*Id.* at 239 n.14 (emphasis added). In *Nobles,* the defense attorney elected to present his investigator, whose notes were at issue, as a witness. Therefore, the Court held that the attorney waived his work-product privilege regarding the matters covered in the investigator's testimony. *Id.* at 239.

Here, Lisle alleges that Seaton used his notes for "testimonial use" and, therefore, waived his work-product protection. However, Lisle never states what testimonial use Seaton allegedly invoked. *See, supra,* note 10. Accordingly, we conclude that Seaton did not waive his work-product privilege. Therefore, the district court did not abuse its discretion by denying Lisle's motion to compel discovery of Seaton's notes.

*The district court did not err in denying Lisle's motion to dismiss Melcher's testimony due to the prosecutor allegedly instructing Melcher not to talk with Lisle's attorney*

In late 1995, Melcher had an appointment with Seaton at the district attorney's office regarding his plea bargain. While Melcher was waiting in the lobby, a man who did not identify

himself to Melcher elicited information from him regarding Logan's and Justin's murders. Melcher thought the man was from the district attorney's office because that was who he was there to meet. However, the man turned out to be an investigator for the public defender's office.

On November 1, 1995, Melcher met with Lisle's attorney at Seaton's office. Seaton stated to Lisle's attorney,

> Tom Gibson [the investigator] was over here and I learned through [Melcher] that Tom started talking to him and didn't reintroduce himself and started asking questions and [Melcher] told me that he was under the impression he was one of the guys who worked up here in the office, just didn't recognize him from the [Logan] trial. And that is—that happens many times with your office, most often with your investigators and that is the reason that you're over here talking to him. You can talk to him in my office while I'm here to protect him or you can talk to him under oath in court. But I've instructed him not to talk to you under any other circumstances.

Lisle's attorney then turned to Melcher and asked him if Melcher would talk to him in his office without Seaton present. Melcher stated that he would, as long as his own attorney said it would be acceptable.

Melcher later testified that Lisle's attorney never contacted him for another interview at his office. However, Lisle's attorney alleges that he attempted to contact Melcher several times and his messages were never returned. Therefore, on December 29, 1995, Lisle filed a motion to dismiss or, in the alternative, to bar Melcher's testimony on the grounds that Seaton impermissibly instructed Melcher not to speak with Lisle's attorney. On March 21, 1996, the court filed its order denying the motion. The judge stated that the State did not interfere with defense counsel's right to interview witnesses.

Lisle asserts that Melcher's testimony should have been dismissed or barred, and since it was not, Lisle's convictions must be reversed.[11] He cites Davis v. State, 110 Nev. 1107, 1120, 881 P.2d 657, 665 (1994), which holds that when a prosecuting attorney suggests to a witness not to talk to defendant, this interferes with defendant's right to access witnesses and his

---

[11]The State responds to Lisle's assertion of misconduct by stating that (1) Seaton was merely protecting Melcher from the defense's deception by the investigator; (2) Seaton did not instruct Melcher not to talk to the defense at all, only that it should be done in Seaton's office; (3) Lisle's attorney freely interviewed Melcher on November 1, 1995, without interference by Seaton; and (4) Melcher relied on the advice of his own attorney, not Seaton, as to whether Melcher should speak with the defense attorney at his office.

efforts to prepare a defense. We concluded that this amounted to incurable prejudice, forcing us to vacate the conviction and dismiss the case with prejudice. *Id.*

*Davis* relied on State v. York, 632 P.2d 1261 (Or. 1981). *York* held that although it is improper for a prosecutor to instruct witnesses to refrain from talking with the defense, no prejudice occurred there. The witness at issue stated that he would not have talked to defense counsel regardless of the prosecutor's instructions. Therefore, the court held that the conviction need not be overturned on this basis. *Id.*

In the instant matter, Melcher told Lisle's attorney that he would be willing to meet with him. In addition, Melcher testified at trial that he never refused to speak with the defense; he stated, however, that the defense never attempted to contact him for another meeting. The trial judge believed Melcher's testimony over the statements by Lisle's counsel that he did attempt to contact Melcher to no avail.

Accordingly, we conclude that even if it was improper for Seaton to instruct Melcher not to speak with Lisle's attorney at his office, no prejudice occurred because Melcher would have spoken with him anyway (assuming his own attorney would have allowed it). The only reason Melcher did not attend such a meeting was because Lisle's attorney allegedly never contacted him. Therefore, since the judge believed this version of events, we conclude that Lisle's allegation is without merit.

*The district court did not err by admitting Sullivan's prior sworn testimony from the Logan trial penalty phase*

At the trial for the instant matter, Sullivan was unavailable as a witness. Therefore, the district court admitted Sullivan's prior sworn testimony from the Logan trial penalty hearing. Lisle objected to its admission. This testimony explained the August 17, 1994 drug transaction between Lisle and Sullivan. Lisle's counsel had asked only one question on cross-examination. Lisle argues that the issues at each proceeding were not substantially the same and that the motives for cross-examining were different.

NRS 51.325 states:

> Testimony given as a witness at another hearing of the same or a different proceeding . . . is not inadmissible under the hearsay rule if:
> 1.   The declarant is unavailable as a witness; and
> 2.   If the proceeding was different, the party against whom the former testimony is offered was a party . . . and the issues are substantially the same.

In State v. Massengill, 657 P.2d 139, 141 (N.M. 1983), appellant contended that former testimony from the preliminary hearing should not have been admitted because the motive to cross-examine was different. A preliminary hearing determines probable cause, while the trial determines guilt beyond a reasonable doubt. The court disagreed with appellant's argument and held that "[t]he issue is whether defendant had an opportunity and a similar motive to develop testimony. . . . The fact that defendant did not choose to further cross-examine does not go to motive. This was a matter of tactics." *Id.*

Here, Sullivan's testimony at the penalty hearing was to show Lisle's bad character of participating in the drug deal. At the present trial, the purpose of the testimony was to show that Lisle participated in the drug deal. Lisle's motive to cross-examine was similar in that at the penalty hearing, Lisle was trying to avoid the death penalty, while at the current trial, Lisle was trying to avoid a murder conviction which could result in receiving the death penalty. Lisle's life was literally in the balance at both proceedings. In addition, Lisle's attorney had a full, complete, and unrestricted opportunity to cross-examine Sullivan, and he has not stated how he would have further impeached Sullivan's testimony. Accordingly, we conclude that the district court did not err by admitting this testimony.

*The district court did not err by denying Lisle's motion for a mistrial when the prosecutor's examination of Melcher, Evans, and Prince may have indicated that Lisle was the "other guy" involved in the Logan murder*

At the trial, the parties and the lower court took great care not to reveal that Lisle was involved in the Logan murder. However, the existence of this murder was relevant to impeach Evans, Melcher, and Prince because their plea bargains each contained agreements to testify at both trials. They each testified as to their knowledge and/or involvement in the Logan murder. All were careful not to mention Lisle's name in their testimony. They each referred to him as "the other guy." However, despite this, it was revealed that this other guy was an adult white male, who was possibly staying at Prince's house.

Outside the jury's presence, the court chastised the prosecutor and ordered him to cure the potential identification of Lisle by eliciting testimony from Prince that many adult white males stayed with Prince.[12] Lisle's attorney moved for a mistrial, argu-

---

[12]At oral arguments before this court, Lisle's attorney suggested that the lower court judge suborned perjury by ordering Prince to "lie" on the stand regarding how many people lived at his place. We disagree and acknowledge

ing that it was obvious that Lisle was Logan's murderer and that the jury's knowledge of this prior bad act substantially prejudiced him. The court denied the motion, ruling that Prince's testimony regarding numerous adult white males cured any problem. Lisle argues that the district court erred.

Denial of a mistrial is within the sound discretion of the district court, and that ruling will not be reversed unless it was an abuse of discretion. Lane v. State, 110 Nev. 1156, 1163, 881 P.2d 1358, 1363 (1994), *cert. dismissed*, 514 U.S. 1058, 115 S. Ct. 1444 (1995).

We conclude that the district court did not abuse its discretion in denying the mistrial because it ordered a curative remedy to the potential problem. Therefore, *any* adult white male who was staying with Prince could have been involved in the Logan murder. No other evidence directly linked Lisle with that case. Accordingly, Lisle's argument is without merit.

*The district court properly denied Lisle's request to call Melcher's attorney to the stand due to the attorney-client privilege*

In 1995, after Lisle allegedly confessed to Melcher that he killed Justin, Melcher supposedly discussed this conversation with his attorney for the purpose of pursuing a plea bargain for the charges against him in the Logan murder. At the trial for Justin's murder, Lisle's attorney attempted to impeach Melcher's testimony regarding what Lisle had stated to him.

Q. When this alleged conversation between you and [Lisle] occurred at the detention center, Laura [FitzSimmons] was still your attorney at that time?
A. Yes.
Q. But you didn't tell her, did you?
A. No.
Q. In fact, didn't she tell you that the District Attorney was interested in the [Justin] Lusch homicide?
. . . .
A. Yes.
Q. And did she ask you if [Lisle] had made any statements to you?
A. I don't remember.
Q. But didn't you tell her that [Lisle] had denied being involved in the homicide?

---

that creating fictions for the jury is often necessary to protect a defendant's rights, as was done here. Additionally, evidence existed in the record that Prince's testimony was truthful, and therefore, no "lies" or fictions were conveyed to the jury.

A. To be honest with you, I can't remember the conversation that me and Laura had.

Q. You may have said that?

A. I may have.

Lisle's attorney moved the court to call Melcher's attorney to the stand regarding whether he made those statements to her because Melcher could not remember. Defense counsel argued that Melcher waived his attorney-client privilege by testifying as to his conversation with his attorney. The court stated that if Melcher did not expressly waive his attorney-client privilege, then his attorney may not be called as a witness.

There is no dispute that the conversations fall within the attorney-client privilege; the question is whether Melcher waived his privilege. If a client voluntarily reveals portions of the communications with the attorney, "those revelations amount to a waiver of the attorney-client privilege as to the remainder of the conversation or communication about the same subject matter." In re Grand Jury Jan. 246, 651 N.E.2d 696, 700 (Ill. App. 1995), *appeal denied,* 657 N.E.2d 622 (Ill. 1995); *see also* Wardleigh v. District Court, 111 Nev. 345, 354, 891 P.2d 1180, 1186 (1995).

However, "mere disclosure of the fact that a communication between client and attorney had occurred does *not* amount to disclosure of the specific content of that communication, and as such does not necessarily constitute a waiver of the privilege." Mitchell v. Superior Court, 691 P.2d 642, 647 (Cal. 1984). Rather, the test for waiver is "whether [the witness's] answers were wide enough in scope and deep enough in substance to constitute a 'significant part of the communication.' " *Id.* at 648 (quoting Travelers Ins. Co. v. Superior Court, 191 Cal. Rptr. 871 (Ct. App. 1983)) (emphasis deleted). Merely acknowledging the fact that the witness discussed a subject with his attorney does not waive the privilege. *Id.*

We conclude that Melcher revealed only that he had discussed the subject with his attorney, but did not reveal the substance of their conversation. Specifically, Melcher could not even remember the substance of what he told her. Accordingly, using the *Mitchell* test, we conclude that Melcher did not waive his privilege. Therefore, the lower court's refusal to allow his attorney to testify was proper.

*Lisle did not properly preserve the issue of whether the prosecutor committed certain misconduct during his closing arguments of the guilt phase*

During closing arguments, the prosecutor used the terms "we"

and "us" on several occasions. However, defense counsel did not object. Therefore, this issue was not properly preserved on appeal, and this court need not consider it. *McCullough,* 99 Nev. at 74, 657 P.2d at 1158.

*The district court did not commit reversible error by striking Detective Darlene Falvey's testimony as irrelevant*

At the penalty hearing, the prosecutor introduced Lisle's judgment of conviction for Logan's murder. In addition, Evans testified as to the facts and circumstances of that murder.[13] For impeachment, Lisle's attorney called Detective Darlene Falvey ("Falvey") as a witness to testify as to prior statements by Evans that Lisle was not the shooter in Logan's death. The prosecutor objected to this testimony and moved that it be stricken because Lisle's attorney was attempting to relitigate the facts of the prior case. The defense disputed the motion, alleging that the testimony went toward Lisle's character and that it impeached Evans' testimony. The district court struck the testimony as irrelevant. Lisle contends that the district court erred and alleges that Evans' credibility and reliability went unchallenged.

The district court has the discretion to admit evidence in the penalty phase of a trial and will not be overturned absent an abuse of that discretion. Pellegrini v. State, 104 Nev. 625, 631, 764 P.2d 484, 488 (1988).

NRS 48.025(2) prohibits irrelevant evidence from being admitted. Relevant evidence means "evidence having any tendency to make the existence of any fact that is *of consequence* to the determination of the action more or less probable than it would be without the evidence." NRS 48.015 (emphasis added). The district court was correct in its ruling that Falvey's testimony was not relevant to Lisle's character.

Furthermore, citing Ransey v. State, 100 Nev. 277, 279, 680 P.2d 596, 597 (1984), Lisle argues that Falvey's testimony showed bias on the part of Evans and bias is always relevant. We conclude that the testimony did not show any bias by Evans.[14] Rather, the testimony proved only that Evans had made prior

---

[13]At the Logan trial, conflicting testimony was presented as to who actually fired the shot killing Logan.

[14]In any event, *Ransey* held that bias may be elicited through cross-examination. Lisle's attorney did cross-examine Evans in an attempt to impeach him. *Ransey,* 100 Nev. at 279, 680 P.2d at 597. Therefore, contrary to Lisle's assertion, Evans' credibility and reliability were challenged.

inconsistent statements with regard to who the shooter was. While we conclude that the testimony should have been admitted as a prior inconsistent statement, the error was harmless beyond a reasonable doubt because the jury in the *Logan* case resolved that factual issue. The testimony would have been irrelevant had the State restricted its proof to the existence and nature of the conviction. Once Evans actually testified, the right to cross-examine included the right to bring out the prior inconsistent statements. This notwithstanding, the evidence in support of the claimed aggravating circumstances was so overwhelming that reversal of the penalty in this case is unwarranted.

*The district court did not err by redacting certain statements to exclude references to Lopez*

Lisle presented the former sworn testimony of Janice Sykes ("Sykes"), Lisle's juvenile probation officer when he was seventeen years old, six years prior. Her testimony described Lisle's involvement with the criminal justice system when he was a juvenile. The district court redacted certain portions of the testimony relating to Lisle's relationship with Lopez. Specifically omitted was testimony that Lisle was ordered, as a ward of the court, not to associate with Lopez. These statements were redacted because they may have prejudiced Lopez, whose sentence was also at issue in the penalty hearing.

One of the mitigating factors Lisle presented was his vulnerability to the influence of others. The jury did not find that this mitigator existed. Lisle contends on appeal that redacting the references to Lopez precluded him from presenting mitigating evidence. *See* Harris v. State, 106 Nev. 667, 671, 799 P.2d 1104, 1106 (1990) ("The sentencing body may not be precluded from considering any relevant mitigating evidence.").

We conclude that Lisle was not precluded from presenting evidence of his vulnerability to the influence of others. For example, his mother testified that Lisle started having problems after he became friends with Lopez and that she did not approve of their friendship.

Moreover, we conclude that Sykes' testimony is irrelevant to whether Lisle was *currently* vulnerable to Lopez because her acquaintance with Lisle occurred six years ago. Further, her testimony does not state that Lopez was a bad influence on Lisle; rather, it could easily be interpreted as Lisle being a bad influence on Lopez. This is especially noteworthy in light of testimony during the guilt phase that Lopez was very quiet and often not present for conversations in which Lisle participated regarding obtaining drugs or killing Justin. Accordingly, Lisle's argument lacks merit.

*The district court properly refused Lisle's proposed jury instruction 8A*

Lisle's attorney proposed the following jury instruction:

> Evidence has been presented concerning other arrests, convictions, or other circumstances. This evidence can be considered by you for character purposes only.
>
> You are instructed that this evidence can only be considered by you after you have determined whether or not the state has proved an aggravating circumstance or circumstances beyond a reasonable doubt, whether mitigating circumstances have been shown to exist and whether or not mitigating circumstances have been shown to outweigh one or more of the aggravating circumstances.
>
> As you have been instructed in instruction #7, death eligibility can only be considered based on the weighing of mitigating and aggravating circumstances. This character evidence cannot be considered in determining the death eligibility of the Defendant. Only after you have made that determination may you then consider this evidence in arriving at a penalty.

The lower court denied this instruction because the judge believed that it misstated the law. Specifically, the judge stated that even if the jury determined that Lisle was not death eligible, it may still consider character evidence in deciding whether to impose a sentence of life with or without the possibility of parole.

"[T]he instruction must correctly state the law. . . . [I]f a proffered instruction misstates the law or is adequately covered by other instructions, it need not be given." Barron v. State, 105 Nev. 767, 773, 783 P.2d 444, 448 (1989).

Lisle has offered no authority to support his interpretation that character evidence cannot be considered until after the jury determines he is death eligible. Whereas, *Pellegrini,* 104 Nev. at 630, 764 P.2d at 488, held that defendant's character is relevant to the jury's determination of the appropriate sentence for a capital crime; *Pellegrini* does not limit the relevance of character evidence to only *after* the jury decides the defendant is death eligible. Rather, it is relevant to determine the sentence. Therefore, we conclude that proposed jury instruction 8A misstates when character evidence may be used in the penalty phase.

Moreover, instruction 7 informs the jury that it must determine whether there are aggravating circumstances and mitigating factors. It further instructs the jury to weigh the aggravators with the

mitigators to determine if the defendant is death eligible. Accordingly, the remainder of instruction 8A is adequately covered by instruction 7. Therefore, the district court did not err by disallowing instruction 8A.

*The prosecutor did not commit reversible misconduct during closing arguments of the penalty phase*

*When the prosecutor used the terms "we" and "us"*

During closing arguments, the prosecutor used the terms "we" and "us" on several occasions. However, as in the guilt phase, defense counsel did not object. Therefore, we need not consider this issue on appeal. *McCullough,* 99 Nev. at 74, 657 P.2d at 1158.

*When the prosecutor told the jury to "send a message"*

During closing arguments, the prosecutor stated,

> Your verdicts here today do a lot of things, one of which is to *send a message—a message to society* and it's incumbent upon you to think about what that message is going to be. Let me ask you this: Is your *message* going to be that if you deal drugs, if you carry guns, if you belong to gangs, if you conspire to kill and indeed you do go out and kill that we're going to give you life with the possibility of parole and one day let you perhaps be walking the streets a free person at the same time the Lusch[es] are visiting their son's grave? Is that the *message* that you want to send? . . . . Or might you prefer to *send a message* to the gang-bangers and the dope dealers and the gun carriers and the killers to be that you're not going to tolerate this type of action in our society.

(Emphasis added.)
Lisle's attorney made an objection, the judge sustained it, and admonished the jury to disregard those statements. Lisle contends, nonetheless, on appeal that the statements were patently improper.

This court held, "[T]he relevant inquiry is whether the comments were so unfair that they deprived the defendant of due process." Witter v. State, 112 Nev. 908, 923, 921 P.2d 886, 897 (1996), *petition for cert. filed,* (March 13, 1997). In *Witter,* during the penalty phase closing argument, the prosecutor commented,

> *It is important to send a message* to people in the community and to would[-]be murderers that there are lines that you do not cross in Nevada; that there is some conduct that simply

will not be tolerated and will be met with a very, very severe penalty.

. . . .

*What message does this punishment send today?* Will we tell would[-]be murderers, will we tell this community, that you can kill a man, thrust a knife into his skull 16 times, one time through his skull, 16 times into his body, that you can perpetrate unspeakable, despicable deeds upon his wife in her own car and that you, the husband, can drive upon that crime scene and witness your wife bleeding to death, struggling for your life, *what message does it send* to say the man that perpetrates those crimes can live his life in prison, can write his family, see his family, speak to his family?

*Id.* at 924-25, 921 P.2d at 897 (emphasis added). This court held that in a penalty hearing the comments "properly focus on what would be an appropriate punishment under the facts and circumstances of this case, as well as what would be necessary to deter others from committing such a brutal act. These are entirely proper areas for comment." *Id.* at 926, 921 P.2d at 898. As the comments in *Witter* are substantially similar to the ones in the present case, we conclude that Lisle's argument is without merit.

*When the prosecutor commented that Lisle did not present psychiatric evidence that his childhood abuse contributed to his current behavior*

One of the mitigating circumstances that Lisle put forth was his physically and sexually abusive childhood and adolescence. During closing arguments, the prosecutor commented that the only evidence of this abuse was from Lisle's mother. He further stated, "I don't remember the psychiatrist who came in and said that there was some sort of an interrelationship between whatever acts happened back in Kevin Lisle's childhood." The court overruled defendant's objection, stating it was the subject of fair comment. The jury did not find Lisle's abusive childhood as a mitigating factor. Lisle contends on appeal that the prosecutor's comment improperly shifted the burden of proof.

This court held that it is generally improper for a prosecutor to comment on the defendant's failure to call witnesses because that shifts the burden of proof to the defense. Whitney v. State, 112 Nev. 499, 502, 915 P.2d 881, 882 (1996). In *Whitney,* the prosecutor made numerous remarks about the defense failing to produce particular fact witnesses. Here, the prosecutor made only a few general remarks about the lack of expert witnesses, not a specific person.

In People v. Kelly, 800 P.2d 516, 538 (Cal. 1990), *cert. denied*, 502 U.S. 842 (1991), during the penalty hearing, the prosecutor commented that the defendant did not present evidence of his longstanding psychological and social pathologies or that such pathologies caused his violent nature. The court held that the prosecutor merely pointed out that the defendant failed to substantiate his claim that the crime he committed was a result of his psychological problems. *Id.*

We conclude that, likewise, the prosecutor in the instant matter was merely pointing out that Lisle did not substantiate his claim of abuse as a mitigator and was contrasting the weight of evidence. Accordingly, the district court did not err in allowing the comments.

*Lisle's death sentence was not improper pursuant to NRS 177.055(2)*

In cases in which the death penalty is imposed, this court is statutorily required to consider whether the death sentence was imposed under the influence of passion, prejudice, or any arbitrary factor and whether the sentence of death is excessive considering both the crime and the defendant. NRS 177.055(2). We conclude that the death sentence was not imposed under the influence of passion, prejudice, or any arbitrary factor, nor was it excessive in this case considering the senseless and violent nature of the crime and the defendant.

## CONCLUSION

We conclude that none of Lopez's or Lisle's allegations have merit. Therefore, we affirm each appellant's conviction, including Lisle's sentence of death.

SPRINGER, J., dissenting:

I dissent to the penalty judgment because I believe the trial court erred in overruling Lisle's objection to the prosecution's comment on Lisle's failure to produce psychiatric testimony in support of his case on mitigating circumstances.

A prosecutor generally may not comment on a defendant's failure to call a witness because such comments tend to shift impermissibly the burden of proof to the defense. Whitney v. State, 112 Nev. 499, 502, 915 P.2d 881, 882 (1996). This shifting of the burden of proof "is improper because '[i]t suggests to the jury that it was the defendant's burden to produce proof by explaining the absence of witnesses or evidence. This implication is clearly inaccurate.' " Ross v. State, 106 Nev. 924, 927, 803 P.2d 1105-06 (1990) (quoting Barron v. State, 105 Nev. 767,

778, 783 P.2d 444, 451 (1989)). The jury in this case may very well have inferred from the challenged comment that a psychiatrist was needed to substantiate the defendant's claims and that because the defendant did not call a psychiatrist to the stand he had not met his burden.[1]

The majority cites People v. Kelly, 800 P.2d 516, 538 (Cal., 1990), *cert. denied,* 502 U.S. 842 (1991) (Prosecutor sought to disassociate defendant's recent violent behavior from psychological and social problems he had faced his entire life.). In *Kelly,* the prosecutor argued that evidence introduced during the penalty phase did not demonstrate that the defendant's social and psychological problems caused him to commit murder.[2] This is distinguishable from the prosecution's comment in the present case on the defendant's failure to call certain witnesses. There is a significant difference between arguing that the evidence does not support the defense's claims and arguing that the defense has failed to call a particular witness or class of witnesses. The former merely questions whether evidence presented substantiates a defendant's claim; the latter implies that the defendant must call certain witnesses in order to substantiate his or her claimed position relative to mitigating circumstances.

During the penalty phase, a defendant has the burden of substantiating mitigating factors but is not required to present certain kinds of witnesses in support of that position. A prosecutor's comment on the defendant's failure to call a witness is not permitted if, as here, it suggests to a jury that the defendant does

---

[1]During the penalty phase, the defendant does have the burden of presenting mitigating evidence. Sonner v. State, 112 Nev. 1328, 930 P.2d 707 (1996). This, however, does not license a prosecutor to comment in a manner that would not be permitted in the guilt phase of a trial. A prosecutor is free to comment that evidence introduced by a defendant does not substantiate mitigating factors just as a prosecutor is allowed to comment that evidence does not support an affirmative defense; the prosecutor may not, however, imply that the defendant is required to call, as a necessary part of the defendant's case, a certain witness or type of witness.

[2]The majority incorrectly writes that the prosecutor "commented that the defendant did not present evidence of his longstanding psychological and social pathologies or that such pathologies caused his violent nature." The *Kelly* defendant presented much evidence of his social and psychological problems, including learning disabilities, brain atrophy, and a "schyzotypal" personality. *See Kelly,* 800 P.2d at 523. Challenged comments made by the prosecutor did not allege that this evidence had not been presented; instead, they suggested that these problems were not the cause of the defendant's recent violent behavior.

Similarly, the prosecutor did not comment on a failure to demonstrate that the defendant's problems caused his violent nature. To the contrary, the prosecution wished to disassociate the defendant's recent violent behavior from the problems he faced his entire life. To do this, the prosecutor tried to show that the defendant did *not* have a violent nature.

have a burden of presenting certain witnesses. The prosecutor's comment that the defendant did not call a psychiatrist as a witness did just that. It went beyond merely pointing out that Lisle did not substantiate his claim of abuse as a mitigating factor.

I would reverse the penalty judgment and remand to the trial court for a new penalty hearing.